page



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 26, 2017**

*Barbara J. Houser*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 14-32939-BJH |
| LLOYD EUGENE WARD, | § | (Chapter 7) |
| | § | |
| DEBTOR. | § | |
| | § | |
| MICHAEL FRANK, DANA BLOCK, | § | ADV. PROC. NO. 15-3050-BJH |
| GREG BURKE, JESSICA CASEY, | § | |
| VICTORIA CASTILLO, JEREMY | § | |
| COZARD, JOHNNY KEEL, VALLERY | § | |
| MANN, JO MINAYA, BRIAN PARKER, | § | |
| CHRISTOPER PITRE, TIM CARR, | § | |
| CODDI DEAN and JOHN NELSON and | § | |
| ROBERT YAQUINTO, TRUSTEE, | § | |
| | § | |
| PLAINTIFFS, | § | |
| v. | § | |
| | § | |
| LLOYD WARD, | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |

### MEMORANDUM OPINION

The Court tried this adversary proceeding (the "**Adversary Proceeding**") on December 12-14, 2016.  Following trial, the Court directed the parties to file amended proposed findings of fact and conclusions of law with citations to the trial record.  The last of those pleadings was filed on January 3, 2017, following which the Court took the matter under advisement.  This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 7052 and 9014.

## I.   JURISDICTION, VENUE, AND STATUTORY AND CONSTITUTIONAL AUTHORITY

The U.S. District Court for the Northern District of Texas has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1334.  Although bankruptcy courts do not have independent subject matter jurisdiction over bankruptcy cases and proceedings, 28 U.S.C. § 151 grants bankruptcy courts the power to exercise certain "authority conferred" upon the district courts by title 28.  Under 28 U.S.C. § 157, the district courts may refer bankruptcy cases and proceedings to the bankruptcy courts for entry of either a final judgment (core proceedings) or proposed findings and conclusions (noncore, related-to proceedings).  So, as relevant here, this Court exercises authority over the Chapter 7 bankruptcy case of Lloyd Ward ("**Ward**") and this Adversary Proceeding pursuant to the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984.  Venue is proper with this Court under 28 U.S.C. § 1409.

Chapter 7 trustee Robert Yaquinto (the "**Trustee**") and the Judgment Creditors[1] (collectively, the "**Plaintiffs**") request that this Court deny Ward's receipt of a discharge under various subsections of 11 U.S.C. §§ 727(a), while the Judgment Creditors also request that this

---

[1] The Judgement Creditors are Michael Frank, Dana Block, Greg Burke, Jessica Casey, Victoria Castillo, Jeremy Cozart, Johnny Keel, Vallery Mann, Jo Minaya, Brian Parker, Christopher Pitre, Tim Carr, Coddi Dean, and John Nelson.  Joint Pretrial Order at 2.

Court find a final, prepetition judgment they hold against Ward (the "**Judgment**")[2] to be nondischargeable in accordance with 11 U.S.C. § 523(a)(6).  A complaint seeking a determination of whether (i) the debtor is entitled to a discharge, and/or (ii) a debt is nondischargeable is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (O).  Accordingly, this Court has statutory authority to hear and finally determine this Adversary Proceeding.  Moreover, this Court has constitutional authority to enter a final judgment in this Adversary Proceeding, which arises solely under 11 U.S.C. §§ 727 and 523 and raises no ancillary issues that may implicate the holding in *Stern v. Marshall*, 564 U.S. 462 (2011).

## II.   FACTUAL AND PROCEDURAL HISTORY

Ward is a lawyer licensed to practice in the state of Texas.  Joint Pretrial Order [AP[3] ECF No. 131] at 12 (Stipulated Fact No. 56).  On May 1, 2014 (the "**Petition Date**"), Ward filed a voluntary petition (the "**Petition**") for relief under Chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "**EDTex Court**"), initiating the above-referenced bankruptcy case denoted in the EDTex Court as Case No. 14-40933 (the "**Case**").  *Id.* at 5 (Stipulated Fact No. 1); DX[4] 3 at 1 of 56.[5]

---

[2] The Judgment Creditors are creditors in the Case, having obtained the Judgment on April 9, 2014, which was subsequently amended, against Ward, Lloyd Ward, P.C. and other non-related defendants, ABC Debt Relief, Ltd. Co., The Debt Answer, LLC, and Lloyd Regner, for violation of the Fair Labor Standards Act for the approximate sum of $782,838.25, in that certain action styled *Parker v. ABC Debt Relief Ltd. Co.*, in the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:10-cv-01332-P-BN.   Joint Pretrial Order at 11-12 (Stipulated Fact No. 55).

[3] "AP" refers to the docket in this Adversary Proceeding, while "BC" refers to the docket in the Case.

[4] The designation "DX" refers to Defendant's Exhibits admitted into evidence at trial, while "PX" refers to the Plaintiffs' Exhibits admitted into evidence at trial.

[5] DX 3 is a composite of several different documents that are not Bates stamped, including a copy of the docket from the EDTex Court, the Petition, the Schedules, and the SOFA.  Page references are to the ECF stamp at the top of the page, which restarts at 1 with each new document within the exhibit.

**MEMORANDUM OPINION**                                                                                           **3**

Along with the Petition, Ward filed his bankruptcy schedules (DX 3 at 6 of 56, the "**Schedules**") and Statement of Financial Affairs (DX 3 at 29 of 56, the "**SOFA**").  Joint Pretrial Order at 5 (Stipulated Fact No. 5).  On January 23, 2015, Ward filed amended Schedules B, C, F, H, I, and J (DX 16, the "**Amended Schedules**") and an amended SOFA (DX 18, the "**Amended SOFA**").  *Id.*

On May 13, 2014, the Judgment Creditors, with the Defendant's consent, filed their unopposed motion in the EDTex Court (the "**Venue Motion**") seeking to transfer the Case to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Court**").  *Id.* at 6 (Stipulated Fact No. 7).  Ward's principal place of business and domicile are within the Northern District of Texas.  *Id.* at 5 (Stipulated Fact No. 4).

The Venue Motion was granted by the EDTex Court by Order entered on June 5, 2014 (the "**Transfer Order**").  *Id.* at 6 (Stipulated Fact No. 8).  On June 20, 2014, the Transfer Order was docketed in, and the Case was received by, this Court as Case No. 14-32939.  *Id.* (Stipulated Fact No. 9).  The Trustee was thereafter appointed.  *Id.*

On June 23, 2014, the Clerk of Court issued a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines (the "**NDTex 341 Notice**").  *Id.* (Stipulated Fact No. 10).  The NDTex 341 Notice provided creditors notice of the § 341 meeting of creditors scheduled for July 22, 2014 and further identified September 22, 2014 as the deadline for filing objections to discharge and the dischargeability of individual debt.  *Id.*  The § 341 meeting was held and concluded by the Trustee on July 22, 2014.  *Id.* (Stipulated Fact No. 11).

On August 27, 2014, the Judgment Creditors filed a motion seeking an extension of the deadline to object to Ward's receipt of a discharge and the dischargeability of the Judgment to December 22, 2014 [BC ECF No. 32] (the "**Extension Motion**").  *Id.* (Stipulated Fact No. 12).

The Trustee filed a joinder in the Extension Motion on September 22, 2014 [BC ECF No. 48] ("**Joinder**"). *Id.* Ward objected to the Extension Motion and Joinder on the basis that the requests were untimely under Bankruptcy Rules 4004(b)(1) and 4007(c) because the objection deadline had already expired. *Id.*

On October 31, 2014, after notice and a hearing, the Court entered the Order Extending Deadline to Object to Discharge and/or Dischargeability of Debt [BC ECF No. 76], granting the Extension Motion in part and extending the deadline by which the Plaintiffs may object to Ward's receipt of a discharge and the deadline by which the Judgment Creditors may object to the dischargeability of the Judgment through and including December 22, 2014.[6] And, after notice and a hearing, the deadline was subsequently extended to February 3, 2015 [BC ECF No. 115] and then to May 1, 2015 [BC ECF No. 158] because, as explained further below, the Plaintiffs established cause for such further extensions. *See infra* at pp. 9-10.

On April 30, 2015, the Plaintiffs filed their Original Complaint Objecting to Discharge Under 11 U.S.C. § 727 and 11 U.S.C. § 523 [AP ECF No. 3] (the "**Original Complaint**"). The Original Complaint was amended multiple times,[7] culminating in the Plaintiffs' Third Amended Complaint Objecting to Discharge Under 11 U.S.C. § 727 and 11 U.S.C. § 523 [AP ECF No. 58] (the "**Third Amended Complaint**"), which is the live complaint before this Court.

## III. LEGAL ANALYSIS

In the Third Amended Complaint, the Plaintiffs argue that Ward's receipt of a discharge should be denied under 11 U.S.C. §§ 727(a)(2), (3), (4)(A), 4(D), and (5), and the Judgment Creditors argue that the Judgment should be held nondischargeable under 11 U.S.C. §523(a)(6).

---

[6] Additional creditors were subject to the extension, but they are not relevant to this Court's analysis.

[7] Plaintiffs filed their first amended complaint on June 22, 2015 [AP ECF No. 17] and their second amended complaint on August 7, 2015 [AP ECF No. 33].

Joint Pretrial Order at 2 (¶ 1). Before reaching the merits of these allegations, however, the Court must first address certain preliminary matters, including Ward's renewed argument that the Adversary Proceeding must be dismissed because the Original Complaint was not timely filed, as well as other defenses that Ward raises in his Defendant's Trial Brief [AP ECF No. 107] and the Joint Pretrial Order.

### A.   Preliminary Matters

#### 1.   The Original Complaint was Timely Filed in Accordance with the Extension Orders Entered by the Court.

Bankruptcy Rules 4004 and 4007, respectively, govern the deadlines for filing objections to a debtor's discharge and the dischargeability of individual debts. Bankruptcy Rule 4004 provides:

> **(a) Time for objecting to discharge; notice of time fixed.** In a chapter 7 case, a complaint…objecting to the debtor's discharge shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a).

> **(b) Extension of Time.** (1) On motion of any party in interest, after notice and hearing, the court may for cause extend the time to object to discharge. Except as provided in subdivision (b)(2),[8] the motion shall be filed before the time has expired.

FED. R. BANKR. P. 4004(a), (b)(1). In turn, Bankruptcy Rule 4007(c) provides that:

> a complaint to determine the dischargeability of a debt under § 523(c)[9] shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). The court shall give all creditors no less than 30 days' notice of the time so fixed in the manner provided in Rule 2002. On motion of a party in interest, after hearing on notice, the court may for cause extend the time fixed under this subdivision. The motion shall be filed before the time has expired.

*Id.* 4007(C).

---

[8] Bankruptcy Rule 4004(b)(2) is not applicable to the facts of this Adversary Proceeding.

[9] Section 523(c) states that "the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section." 11 U.S.C. § 523(c)(1).

Ward's defense of untimeliness resulted from the voluntary transfer of the Case to this Court. When Ward filed his Petition, the Clerk of the EDTex Court issued a notice informing parties in interest that the § 341 meeting of creditors would be held May 30, 2014 and that the deadline to object to Ward's receipt of a discharge and the dischargeability of individual debts would be July 29, 2014.[10] When the Case was transferred to the Northern District of Texas, the Clerk of Court issued the NDTex 341 Notice, informing parties in interest that the § 341 meeting of creditors would be held July 22, 2014 and the deadline to object to Ward's receipt of a discharge and the dischargeability of individual debt would be September 22, 2014.

In reliance on the NDTex 341 Notice, the Judgment Creditors filed the Extension Motion on August 27, 2014, which the Trustee joined on September 22, 2014. Thus, the issue before the Court at the October 21, 2014 hearing on the Extension Motion, and which Ward re-urges now,[11] is whether the Original Complaint was timely filed. For the reasons explained below, the Court reiterates its earlier conclusion that the Plaintiffs properly relied upon the objection deadline in the NDTex 341 Notice and that the Original Complaint was timely filed.

As an initial matter, the Court agrees with Ward that the filing deadlines of Bankruptcy Rules 4004 and 4007 are interpreted strictly. Indeed, "[t]he strict time limitation placed upon creditors who wish to object to a debt's dischargeability reflects the Bankruptcy Code's goal of

---

[10] The Court takes judicial notice of the Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines issued by the Clerk of the EDTex Court. Case No. 14-40933, ECF No. 5.

[11] Ward argues that the orders extending the deadline are interlocutory. Defendant's Trial Brief at 15 n.4 (citing *Aucoin v. S. Ins. Facilities Liquidating Corp. (In re Aucoin)*, 35 F.3d 167 (5th Cir. 1994)). And, as an interlocutory order, "the Court, pursuant to FED.R.BANKR.P. 7054 and 9014, has the jurisdiction and the discretion 'to reconsider [the] issue and should exercise that discretion whenever it appears that a previous ruling, even if unambiguous, might lead to an unjust result.'" *Id.* (citing *Anthanassious v. Palmer (In re Anthanassious),* 418 Fed. Appx. 91, 95 (3d Cir. 2011) (unpublished)). The Court agrees that it retains the ability to reconsider its interlocutory order. *See Charalambopoulos v. Grammer*, 2016 WL 5942225 (N.D. Tex. October 13, 2016) (finding that the court possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient). The Court, however, finds that Ward has not shown cause for such reconsideration, as he has done nothing more than re-urge the same arguments previously considered and rejected by this Court. Nonetheless, and in an abundance of caution, the Court will again address Ward's argument in this Memorandum Opinion.

providing debtors with a fresh start." *State Bank & Trust, N.A. v. Dunlap (In re Dunlap)*, 217 F.3d 311, 315 (5th Cir. 2000); *Neeley v. Murchison*, 815 F.2d 345, 347 (5th Cir.1987) (stating that Rule 4007 "places a heavy burden on the creditor to protect his rights").   However, the Court disagrees with Ward that the Original Complaint was not timely filed.  This is so because Bankruptcy Rules 4004 and 4007 can be, and have been, harmonized with other principles and rules without losing their strictness, and the Fifth Circuit has recognized situations in which the deadline should be deemed to have occurred *after* the sixtieth day following the first date set for the § 341 meeting of creditors.  *See, e.g., Coston v. Bank of Malvern (In re Coston)*, 987 F.2d 1096, 1099 (5th Cir. 1992) (holding the deadline ran from the second setting of the § 341 meeting when the initial proceedings were stayed due to the pendency of a related involuntary case in another state); *In re Dunlap*, 217 F.3d at 314–17 (holding that the "first date set" for the § 341 meeting does not mean the date set in the first notice if circumstances, such as an intervening dismissal of the case, prevent a creditor from timely filing a complaint objecting to discharge); *In re Castleman*, 2011 WL 925567, at *3–4 (Bankr. N.D. Tex. March 24, 2011) (holding that creditors may rely on an affirmative misstatement by the Clerk as to the deadline to object to a debtor's discharge); *Official Comm. of Unsecured Creditors of the Project Grp., Inc. v. Crawford (In re Crawford)*, 347 B.R. 42, 48 (Bankr. S.D. Tex. 2006) (citing to *Neeley v. Murchison* in support of the "conclu[sion] that the Fifth Circuit would follow the Sixth, Eighth, Ninth, and Tenth Circuits in holding that an affirmative misstatement of the deadline extends the deadline...."); *see also Neeley v. Murchison*, 815 F.2d at 347 n.5 (5th Cir. 1987) (differentiating between situations in which a Clerk does not provide any information about the discharge objection deadline and situations in which a Clerk provides "affirmative but erroneous notice of a bar date").

Moreover, the Court does not find the cases relied upon by Ward in his Defendant's Trial Brief persuasive.  Indeed, virtually all of them appear to be cited to for general propositions regarding filing deadlines under the Bankruptcy Code and Rules, which is unsurprising and not particularly helpful here, where the NDTex 341 Notice (which was issued after the EDTex Court transferred the Case here) clearly states that the deadline to object to Ward's receipt of a discharge and the dischargeability of individual debts was September 22, 2014.  The one case that is somewhat on point, *Owen v. Miller (In re Miller)*, 2006 WL 6507922 (N.D. Tex. March 28, 2006), involved a situation where, although there was inconsistent information regarding when the § 341 meeting of creditors would be held, at all times the docket listed January 1, 2005 as the relevant objection deadline.  *Id.* at *2.  Moreover, the creditor in *Miller* never alleged that it received official information from PACER or the Clerk's office that the January 1, 2005 deadline had changed or been reset.  *Id.*  Thus, the Court finds *Miller* distinguishable from the facts at hand.

Here, the Clerk of Court issued and served to parties in interest the NDTex 341 Notice which clearly stated that September 22, 2014 was as the deadline for parties to object to Ward's receipt of a discharge and the dischargeability of their debts.  All parties in interest in the Case, including the Plaintiffs, were entitled to rely on the information contained in the NDTex 341 Notice.  Thus, September 22, 2014 is deemed the applicable deadline for parties to file objections to Ward's receipt of a discharge or the dischargeability of their individual debts.  The Plaintiffs timely sought to extend that deadline and carried their burden to establish "cause" to do so at the October 21, 2014 hearing on the Extension Motion, as well as at subsequent hearings related to further extensions of the deadline, by demonstrating, among other things, that the Plaintiffs were diligent in investigating very complicated pre-bankruptcy transactions involving Ward and his

**MEMORANDUM OPINION**                                                                                          9

complex web of entities (which are discussed in more detail below) and the substantial questions raised with respect to the accuracy of documents Ward filed with the Court.

For the reason explained above, the Court concludes that the Plaintiffs timely filed the Original Complaint. Thus, Ward's request to dismiss this Adversary Proceeding is denied.

### 2. Ward's Miscellaneous Other Defenses Reflected in the Joint Pretrial Order are Without Merit.

Ward also raised various other defenses to the Third Amended Complaint, including alleging that: (i) the Third Amended Complaint must be dismissed in accordance with Federal Rule of Civil Procedure ("**Civil Rule**") 12 because it fails to comply with Civil Rule 8(a)(1) as incorporated by Bankruptcy Rule 7008, (ii) res judicata[12] prevents this Court from deciding matters already decided by the Court in its final judgment entered in *Yaquinto v. Ward*, Adv. Proc. No. 15-03037 (the "**GPC Adversary**"), and (iii) the Plaintiffs may not sue on claims released as part of a settlement previously approved by this Court in relation to the Ward Legal Group, PLLC f/k/a Ward, Bell & Gallegos, PLLC. Joint Pretrial Order at 4-5, ¶¶ 7-9, 11-13. The Court will address these defenses in turn.

First, Ward argues that the Court must dismiss this Adversary Proceeding due to the Plaintiffs' failure to comply with Civil Rule 8(a)(1), as incorporated by Bankruptcy Rule 7008. To analyze Ward's argument, the Court must first look to the requirements contained in each rule, beginning with Bankruptcy Rule 7008, which states that:

> Rule 8 F.R.Civ.P. applies in adversary proceedings. The allegation of jurisdiction required by Rule 8(a) shall also contain a reference to the name, number, and chapter of the case under the Code to which the adversary proceeding relates and

---

[12] Ward refers to both res judicata and collateral estoppel in the Joint Pretrial Order and the Defendant's Trial Brief. As explained in *Gidner v. JPMorgan Chase Bank N.A. (In re Gidner)*, 2013 WL 5596971 (Bankr. N.D. Tex. 2013), the doctrine of res judicata embraces two distinct preclusion concepts: claim preclusion (also referred to as "res judicata") and issue preclusion (also referred to as "collateral estoppel"). *Id.* at * 8 (citing *U.S. v. Shanbaum*, 10 F.3d 305, 310 (5th Cir.1994)). Thus, the Court's use of the term "res judicata" in this Memorandum Opinion encompasses both concepts.

> to the district and division where the case under the Code is pending. In an adversary proceeding before a bankruptcy court, the complaint, counterclaim, cross-claim, or third-party complaint shall contain a statement that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy court.

FED. R. BANKR. P. 7008. In turn, Civil Rule 8(a) requires that the pleading contain "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support." FED. R. CIV. P. 8(a); *see* Joint Pretrial Order at 4 (¶ 7); Defendant's Trial Brief ¶¶ 27-30.

Ward argues that, because the Third Amended Complaint does not contain the required jurisdictional statement or a statement that the Plaintiffs consent to this Court entering a final order, the Court must dismiss the Adversary Proceeding in its entirety, particularly since the Plaintiffs amended the Original Complaint several times but never included the required statement. As explained below, the Court disagrees,

Although the Third Amended Complaint is missing the statement required by Civil Rule 8(a) and Bankruptcy Rule 7008, the deficiency is not fatal, especially when, as here, the Court is able to determine its jurisdiction and the core nature of the claims asserted based upon the face of the Third Amended Complaint. *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 196 F.3d 1, 5 (1st Cir. 1999) ("Affirmative pleading of the precise statutory basis for federal subject matter jurisdiction is not required as long as a complaint alleges sufficient facts to establish jurisdiction."); *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 605 F.2d 1340, 1343 (5th Cir. 1979) (holding that failure include the jurisdictional statement required by Civil Rule 8(a) is not fatal when "diversity jurisdiction is evident from the face of the complaint"), *cert. denied*, 445 U.S. 929 (1980); *Carlson v. Attorney Registration and Disciplinary Comm'n of the Supreme Court of Ill. (In re Carlson),* 202 B.R. 946, 948 (Bankr. N.D. Ill. 1996) (holding that failure to include jurisdictional statement or allegation that proceeding was core or non-core in a

discharge complaint was not a jurisdictional defect since alleged facts provided a basis for assumption of jurisdiction); *Painter v. First Fed. Sav. & Loan Ass'n of S.C. (In re Painter),* 84 B.R. 59, 61 (Bankr. W.D. Va.1988) (finding requirement of Rule 7008(a) that complaint contain allegation that matter is core or non-core "is technical in nature and certainly not fatal to the complaint").

Here, as more fully explained in Section I of this Memorandum Opinion, the Court already has jurisdiction over Ward, the Case, and this core Adversary Proceeding that alleges claims arising solely under 11 U.S.C. §§ 727 and 523. Moreover, because the Third Amended Complaint only implicates bankruptcy law, the constitutional limitations that *Stern* placed on this Court's authority to enter final orders in certain statutorily core matters involving state law claims is not applicable. Accordingly, the jurisdictional statement described in Civil Rule 8(a) is not necessary here. Similarly, there is also no need for the Plaintiffs to consent to this Court's entry of a final order, as the Court already has both the statutory and constitutional authority to do so. Thus, the Plaintiffs failure to include within the Third Amended Complaint the statement required by Civil Rule 8(a) and Bankruptcy Rule 7008 is not fatal, as the Court can garner all the necessary information from the face of the Third Amended Complaint. Accordingly, Ward's request to dismiss the Adversary Proceeding is denied.

Second, Ward argues that the Plaintiffs may not re-litigate matters already decided as part of the final judgment entered in the GPC Adversary. While the Court agrees that it may not re-litigate issues already decided in the GPC Adversary, it is not doing so here and this defense must also be rejected. Before turning to its analysis of this argument, it is helpful for the Court to give a brief overview of Ward's various entities, several of which are implicated in both this Adversary

Proceeding and the GPC Adversary, as well as the complaint and judgment entered in the GPC

Adversary, which the Court will address in turn.

There are primarily two bankruptcy documents that require a debtor to disclose entities he

either owns or has served in a managerial capacity for. First, Schedule B requires a debtor to list

all of his personal property. More specifically, Item 13 of Schedule B requires a debtor to provide

an itemized list of all "[s]tock and interests in incorporated and unincorporated businesses." In

response, Ward listed the following entities on his Amended Schedule B filed January 23, 2015:

- Lloyd Ward & Associates, P.C.,

- Ward Holdings Inc. f/k/a Ward Investments, Inc.,

- Lloyd Ward P.C.,

- Lloyd Ward Group, P.C.,

- VL Capital, LLC,

- Glenn Properties Corp. ("**GPC**"), described as "Wife's separate property identified herein for disclosure purposes only," and

- Best Account Receivables Management Solutions LLC ("**BRM**"), described as "100% owned by spouse – her sole management community property – identified herein for disclosure purposes only."

DX Ex. 16 at 4 of 16 (Item 13). In turn, the Statement of Financial Affairs (Item 18) requires a

debtor to list all entities in which he has served as an officer, director, or in a managerial-type

capacity during the prior six years.[13] In response, Ward listed the following entities on his

Amended SOFA:

---

[13] Item 18, titled "Nature, location and name of business," reads as follows:

> If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.

**MEMORANDUM OPINION**                                                                                    13

- Lloyd Ward & Associates, P.C.,

- Ward Holdings Inc. f/k/a Ward Investments,

- Lloyd Ward, P.C.,

- Lloyd Ward Group, P.C.,

- VL Capital LLC,

- Camden Credit Services, Inc.,

- Blue Ridge Recovery, Inc.,

- Camden Debt Solutions, Inc.,

- The Business Orchard, LLC,

- Bainbridge [*sic*[14]] Management, Inc.,

- 3200 Thomas Condominium Homeowners Assn.,

- Fight Night Holdings, LLC,

- Raglaw, Inc.,

- Settlement Compliance Commission Inc.,

- M.O.S.S. Staffing, Inc., and

- Silverleaf Debt Solutions, LLC.

DX Ex. 18 at 7-8 of 10 (Item 18).

The defendants in the GPC Adversary were Ward, Amanda Ward (Ward's wife), GPC, and

BRM, although the complaint also included allegations involving non-defendant Lloyd Ward &

Associates, P.C. The complaint alleged eight separate counts:[15] Count I: Reverse Piercing of the

---

[14] At trial, Ward testified that this entity was actually "Brainbridge Management, Inc." Tr. Trans. 12/14/16 at 140:7-21 (Ward).

[15] As stipulated by the parties:

> In the GPC Adversary, Trustee sought (i) a declaration that GPC and BRM [Best Receivables Management Solutions, LLC] were alter egos of Amanda Ward, Defendant's [Ward's] wife, under reverse piercing, (ii) a declaration GPC and BRM were alter egos of Defendant under reverse piercing, (iii) a declaration that the estate was entitled to a constructive trust over real properties owned by GPC, (iv) a claim against GPC for the enhanced value to its properties resulting from

**MEMORANDUM OPINION**                                                                    **14**

Corporate Veil (Alter Ego) Against Amanda, which sought a judgment declaring that Amanda is the alter ego GPC and BRM and, as such, the assets of GPC and BRM are Amanda's property; Count II: Reverse Piercing of the Corporate Veil (Alter Ego) Against Ward, which sought a judgment declaring that Ward is the alter ego of GPC and/or BRM and, as such, the assets of GPC and/or BRM are property of Ward's bankruptcy estate;[16] Count III: Constructive Trust, which sought a judgment imposing a constructive trust on the properties and assets held by GPC with GPC as the constructive trustee for the benefit of Ward's bankruptcy estate and ordering GPC, as constructive trustee, to convey all or part of the properties held by it to Ward's bankruptcy estate; Count IV: Reimbursement for Time, Toil, and Effort Regarding GPC, which was ultimately withdrawn; Count V: Reimbursement for Time, Toil, and Effort Regarding BRM, which was ultimately withdrawn; Count VI: Declaratory Judgment Regarding GPC, which sought a declaratory judgment that the assets of GPC are property of Ward's bankruptcy estate; Count VII: Declaratory Judgment Regarding BRM, which sought a declaratory judgment that the assets of BRM are property of Ward's bankruptcy estate; and Count VIII: Substantive Consolidation of GPC and/or BRM with Ward's bankruptcy estate so that GPC and/or BRM and all assets held by GPC and/or BRM are property of Ward's bankruptcy estate. *See* Plaintiff's Second Amended Complaint, Adv. Proc. No. 15-3037 [ECF No. 117].

---

Defendant's time, toil and effort, (v) a claim of reimbursement against GPC for Defendant's efforts, (vi) a declaration that the real property owned by GPC is property of the bankruptcy estate, (vii) a declaration that BRM is community property owned by Defendant's bankruptcy estate, and (viii) substantive consolidation of GPC and BRM with Defendant's bankruptcy estate.

Joint Pretrial Order at 15 (Stipulated Fact No. 75).

[16] Counts I and II were not pled in the alternative, so the relief requested was internally inconsistent. Obviously, the assets of GPC and BRM cannot be both Amanda's property (Count I) and property of Ward's bankruptcy estate (Count II).

The defendants in the GPC Adversary (other than Ward) moved for summary judgment on all counts, which the Court granted on the following grounds:[17]

> Under Texas law, reverse piercing of the corporate veil is a remedy and not an independent cause of action. Because the Complaint does not contain a count that would support recovery under a reverse-piercing theory, and because the Plaintiff does not hold a judgment against any of the Defendants that would support a recovery under a reverse-piercing theory, Counts I and II fail as a matter of law.

> Under Texas law, constructive trust is a remedy and not an independent cause of action. Because the Complaint does not contain a count that would support the imposition of a constructive trust, Count III fails as a matter of law. Further, the Plaintiff failed to raise a genuine issue of material fact as to each element necessary for the imposition of a constructive trust. Specifically, the summary judgment record does not contain sufficient evidence to permit this Court to infer that there was a fraud or breach of fiduciary duty in relation to the purchase, maintenance, or improvement of GPC's assets. In fact, the Complaint is devoid of any allegation of such fraud or breach of fiduciary duty.

> The Plaintiff failed to raise a genuine issue of material fact regarding the elements of his Count VIII [substantive consolidation] claim, and Count VIII fails as a matter of law. Further, because Counts VI and VII are dependent upon the Count VIII substantive consolidation claim,[18] they also fail as a matter of law.

Final Judgment, Adv. Proc. No 15-3037 [ECF No. 165] at 2-3. Because the Court granted summary judgment in favor of both GPC and BRM, it also dismissed the Count II (alter ego) claim against Ward.[19]

Turning to Defendant's Trial Brief in this Adversary Proceeding, Ward argues that

> Here, the claims raised in both the GPC Adversary and the instant one have the same nucleus of operative facts – the nature of Defendant's interest in the Residence [a home located in Dallas that is owned by GPC and in which Ward and his family reside], GPC and BRM – in determining the bankruptcy estate's interest, if any, in

---

[17] The Trustee withdrew Counts IV and V at the hearing on the motion for summary judgment, so the Court did not address those Counts in its Final Judgment.

[18] At the hearing on the motion for summary judgment, the Trustee's counsel admitted that the only way that the Trustee could succeed on Counts VI and VII was if this Court held that substantive consolidation was appropriate. Accordingly, when Count VIII failed, Counts VI and VII also failed.

[19] Although Ward did not move for summary judgment in the GPC Adversary, GPC and BRM did. And, because the Court granted GPC's and BRM's requests for summary judgment on Count II, Ward was the sole remaining defendant subject to that count. Because an alter ego claim may not stand without the existence of an alleged alter ego, Count II also failed as to Ward as a matter of law.

those assets on the one hand, and in determining the accuracy of Defendant's characterization of GPC and BRM on his bankruptcy schedules on the other hand.

As those claims have been adjudicated in the GPC Adversary, Plaintiffs are barred from relitigating them in this one."

Defendant's Trial Brief at 20 (¶¶ 37-38).

Although the Court agrees with Ward's basic legal proposition, it is not applicable here. For the reasons explained further in the analysis section of this Memorandum Opinion, the Court concludes that Ward's receipt of a discharge should be denied under 11 U.S.C. § 727(a)(4)(A) and § 727(a)(5) for reasons wholly independent of the allegations made in the GPC Adversary regarding Ward's alleged ownership of the Residence, GPC, and/or BRM and his alleged failure to include those entities and/or their assets in his Schedules and Amended Schedules. Accordingly, Ward's request to dismiss the Adversary Proceeding is denied.

Finally, Ward argues that the Plaintiffs may not urge claims that were previously disposed of by a settlement approved by this Court in relation to two adversary proceedings—*Yaquinto v. Ward.*, Adv. Proc. No. 15-03033 (the "**Banks Adversary**"), and *Yaquinto v. Monroe*, Adv. Proc. No. 15-03053 (the "**Monroe Adversary**"). Each settlement will be analyzed.

The dispute in the Banks Adversary centered on a substantial contingency fee resulting from an over $5.7 million postpetition judgment entered in favor of the Banks by a state court in Arkansas.[20] The defendants in the Banks Adversary contended that an attorney named Steven Bell was the beneficiary of the contingency agreement, and that Ward only served as local counsel entitled to payment at a set hourly rate. The Trustee, however, alleged that, via alter ego and the avoidance of allegedly improper transfers of Ward's interest in the law firm of Ward, Bell &

---

[20] As stipulated to by the parties in the Joint Pretrial Order, "[i]n the Banks Adversary, Trustee sought a determination of the estate's rights in a certain contingent fee award arising from a judgment entered post-petition in a state court suit in Arkansas, an injunction as to that award, an alter ego finding and avoidance of certain alleged transfers under chapter 5 of the Bankruptcy Code and state law." Joint Pretrial Order at 14-15 (Stipulation No. 73).

Gallegos PLLC, Ward was the true beneficiary of the contingency agreement. The complaint contained the following allegations: Count I: Declaratory Action, which sought a declaratory judgment that the contingency fee was property of Ward's bankruptcy estate and any transfer of the right to that fee was an impermissible transfer; Count II: Piercing of the Veil (Alter Ego) as to Lloyd Ward and Lloyd Ward & Associates, P.C., which sought a finding that Lloyd Ward & Associates, P.C. was Ward's alter ego; Count III: Fraudulent Transfers Pursuant to 11 U.S.C. § 548, seeking the avoidance of transfers allegedly related to Ward's interest in Ward, Bell & Gallegos PLLC or the contingency fee under bankruptcy law; Count IV: Fraudulent Transfers under 11 U.S.C. § 544 and Tex. Bus. Comm. C. §§ 24.005, 24.006 (TUFTA), seeking the avoidance of transfers allegedly related to Ward's interest in Ward, Bell & Gallegos PLLC or the contingency fee under Texas state law; Count V: Temporary Restraining Order/Preliminary Injunction to prevent dissipation of the contingency fee award pending the outcome of the Banks Adversary; Count VI: Avoidable Transaction under 11 U.S.C. § 549, seeking the avoidance of alleged postpetition transfers of the contingency fee and/or the right to receive such fees; and Count VII: Turnover of Property to the Estate Under 11 U.S.C. § 542, seeking an order directing third parties to turnover property of the estate, including fees from the Banks case, to the Trustee. Plaintiff's Second Amended Complaint, Adv. Proc. No. 15-3033 [ECF No. 38].

As stipulated to by the parties, the claims in the Banks Adversary

were settled through two settlements approved by the Court which resulted in a mutual release of claims and payment of settlement funds to the estate. Under the settlement with Defendant, Plaintiffs released Defendant of any and all issues raised and claims asserted in this adversary proceeding, Adv. No. 15-03050, arising from, relating to, and based on the allegations contained in paragraphs 17 and 36 of the original Complaint and any comparable allegations that may be made in any amended complaint filed in this action. A stipulation evidencing Plaintiffs' release, withdrawal and waiver was filed in this proceeding on August 14, 2015 [Doc. No. 35].

Joint Pretrial Order at 14-15 (Stipulated Fact No. 73). Thus, the next step in this Court's analysis is to review paragraphs 17 and 36 of the Original Complaint and compare those allegations to the allegations in the Third Amended Complaint.

Paragraph 17 of the Original Complaint alleges various misrepresentations on Ward's original Schedule D (titled "Creditors Holding Secured Claims") involving alleged loans from Allen Monroe to Ward and Amanda that the Trustee argued should be reclassified as gifts, while paragraph 36 alleged that Ward disposed of various assets without notifying the Trustee, including the postpetition removal of Ward as a governing person of Ward Bell & Gallegos, PLLC. The Court has reviewed the settlement agreement, its order approving the settlement agreement, the Original Complaint, the Third Amended Complaint, and all ancillary documents and finds that none of the claims previously released in relation to the Banks Adversary are raised by the Plaintiffs in the Third Amended Complaint. To the extent that any such allegations may arguably remain, they were not considered by this Court in reaching the findings and conclusions contained in this Memorandum Opinion. Accordingly, Ward's request to dismiss the Adversary Proceeding is denied.

Turning to the Monroe Adversary, it was a lawsuit brought by the Trustee against Allen Monroe, M Real Estate, Inc., Ward, and Ward Legal Group, PLLC f/k/a Lloyd Ward & Associates, P.C. centered on alleged loans from Allen Monroe or M Real Estate, Inc. to Ward and/or Amanda.[21] The complaint contained the following allegation: Count I: Declaratory Judgment,

---

[21] As stipulated to by the parties in the Joint Pretrial Order:

> In the Monroe Adversary, Trustee sought a determination that defendants [Allen Monroe and M Real Estate, Inc.] were not creditors of [Ward's] bankruptcy estate and not entitled to a security interest in stock interests, turnover of those interests and avoidance of the transfer of such security interest under chapter 5 of the Bankruptcy Code and state law. These claims were settled along with the Banks Adversary.

Joint Pretrial Order at 15 (Stipulated Fact No. 74).

**MEMORANDUM OPINION**                                                                                      **19**

seeking a declaratory judgment that, among other things, (i) the funds at issue were gifts, not loans, (ii) Allen Monroe and M Real Estate, Inc. are not creditors of Ward's bankruptcy estate nor are they entitled to any security interests in property of the estate, including Ward's interests in Lloyd Ward & Associates, P.C., and (iii) the Trustee owns the stock of Lloyd Ward & Associates, P.C.; Count II: Fraudulent Transfer Pursuant to 11 U.S.C. § 548, which sought to avoid the attempted transfer of security from Ward to Allen Monroe or M Real Estate, Inc. under bankruptcy law; Count III: Fraudulent Transfers under 11 U.S.C. § 544 and Tex. Bus. Comm. C. §§ 24.005, 24.006 (TUFTA), seeking to avoid the attempted transfer of security from Ward to Allen Monroe or M Real Estate, Inc. under Texas state law; and Count IV: Turnover of Property to the Estate Under 11 U.S.C. § 542, seeking an order directing any defendant in possession of the stock certificates of Lloyd Ward & Associates, P.C. to turnover that property to the Trustee. Plaintiff's Complaint, Adv. Proc. No. 15-3053 [ECF No. 1].

On June 30, 2015, the Trustee filed a motion seeking approval of a settlement resolving the Monroe Adversary, which the Court granted on August 5, 2015. In accordance with the settlement, the Court entered an Agreed Order of Dismissal on October 13, 2015, dismissing the Monroe Adversary with prejudice. Agreed Order of Dismissal with Prejudice, Adv. Proc. No. 15-3053 [ECF No. 7].

In relation to the Monroe Adversary, the Court has reviewed the complaint filed in that adversary proceeding, the related settlement, the order approving that settlement, the order dismissing the Monroe Adversary with prejudice, the Third Amended Complaint, and all ancillary documents. Based upon this review, the Court finds that none of the claims previously dismissed with prejudice in the Monroe Adversary are raised by the Plaintiffs in the Third Amended Complaint. To the extent that any such allegations may arguably remain, they were not considered

by this Court in reaching the findings and conclusions contained in this Memorandum Opinion. Accordingly, Ward's request to dismiss the Adversary Proceeding is denied.

With these preliminary matters addressed, the Court will now turn to the claims asserted in the Third Amended Complaint.

### B.    The Standard Under § 727(a) Generally.

Bankruptcy Rule 4005 places the burden of proof on the party objecting to discharge.  FED. R. BANKR. P. 4005.  Moreover, the § 727 exceptions to discharge are construed liberally in favor of the debtor and strictly against the objecting party in furtherance of the "fresh start" policy of the Bankruptcy Code.  *McClendon v. DeVoll (In re DeVoll)*, 266 B.R. 81, 97 (Bankr. N.D. Tex. 2001) (citing cases).  The objecting party must prove its grounds for objecting to a debtor's receipt of a discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991); *In re DeVoll*, 266 B.R. at 97-98.

### 1.    Section 727(a)(4)(A) – Ward Knowingly and Fraudulently Made a False Oath or Account.

The Plaintiffs ask this Court to deny Ward's receipt of a discharge because he knowingly and fraudulently made a false oath or account as proscribed by 11 U.S.C. § 727(a)(4)(A).  More particularly, the Plaintiffs allege that Ward falsely testified at both trial and his § 341 meeting of creditors and that he filed multiple false documents with the Court under penalty of perjury, namely the Schedules and SOFA and the Amended Schedules and Amended SOFA.

Section 727(a)(4) of the Bankruptcy Code conditions the debtor's receipt of a discharge on his truthfulness: "The court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  To prevail on a claim under this subsection, a plaintiff must prove by a preponderance of the evidence that "'(1) the debtor made a ... statement under oath; (2) the

statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case.'" *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009) (quoting *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir.2001)). Circumstantial evidence may be used to prove fraudulent intent, and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent. *Id.* (citing *In re Sholdra*, 249 F.3d at 383).

"False statements in the debtor's schedules or false statements by the debtor during the proceedings are sufficient to justify denial of discharge." *Id.* (citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992)). Moreover, the materiality of an omission is not based solely on the value of the item omitted or whether it harmed creditors. *Id.* Rather, the statement need only "'bear[ ] a relationship to the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of his property.'" *Id.* (alternations in original) (quoting *In re Beaubouef*, 966 F.2d at 178). As explained by the Fifth Circuit,

> [t]he recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. It makes no difference that he does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.

*In re Beaubouef,* 966 F.2d at 178 (quoting *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984)). Amendments to schedules and statements of financial affairs will "not negate the fact that [the debtor] made knowingly false oaths in his original schedules and statement of financial affairs." *In re Sholdra*, 249 F.3d at 382 (citing *Mazer v. U.S.*, 298 F.2d 579, 582 (7th Cir. 1962)). This is even more true when the debtor files those amendments only after the falsity

of the original schedules and statements was revealed. *Id.*; *see also Neese v. Garcia*, 2010 WL 2545706, at *2 (Bankr. D. Md. June 18, 2010) ("The subsequent amendment of statements or schedules after their falsity is discovered does not negate the effect of the original fraud.").

If the plaintiff establishes a prima facie case, then the burden shifts to the debtor. *In re Duncan*, 562 F.3d at 696 (citing *First Tex. Savings Ass'n v. Reed (In re Reed),* 700 F.2d 986, 992 (5th Cir.1983) ("While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case.")).

With this understanding of the requirements of § 727(a)(4)(A), the Court turns to the false statements here.

### a) Ward Misrepresented His Income in his SOFA and Amended SOFA

When a debtor files his bankruptcy petition, he is required to complete various forms that are intended to disclose his assets, liabilities, and other information relevant to his financial situation, both as of and prior to the bankruptcy petition date. These documents include the Schedules and the Statement of Financial Affairs. Item 1 on the Statement of Financial Affairs, which is titled "Income from employment or operation of business," requires the debtor to:

> [s]tate the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

In his SOFA filed on May 1, 2014, Ward disclosed the following in response to Item 1:

| Amount | Source | |
|---|---|---|
| $42,271.50 | Wages/distributions | 2012 |
| $41,180.11 | Wages/distributions | 2013 |
| $7,964.60 | Wages/distributions | 2014 (YTD) |

DX 3 at 29 of 56.

Ward filed his Amended SOFA on January 23, 2015. His initial disclosure of wages/distributions remained unchanged, but he added significant amounts described as "[c]ompany distributions/expense payments:"

| Amount | Source | |
|---|---|---|
| $42,271.50 | Wages/distributions | 2012 |
| $41,180.11 | Wages/distributions | 2013 |
| $7,964.60 | Wages/distributions | 2014 (YTD) |
| $60,000.00 | Company distributions/ expense payments | 2012 |
| $50,000.00 | Company distributions/ expense payments | 2013 |
| $24,917.70 | Company distributions/ expense payments | 2014(YTD) |

DX 18 at 1.

Turning to the Third Amended Complaint, one of the alleged grounds for denying Ward a discharge is that he fraudulently understated his gross income on his SOFA and Amended SOFA. To fully consider this allegation, the Court must first determine exactly what SOFA Item 1 requires Ward to disclose.

The term gross income is not defined in the Statement of Financial Affairs, the official Instructions to the Statement of Financial Affairs,[22] or the Bankruptcy Code. However, when defining "gross income" as used in various portions of the Bankruptcy Code, courts have turned

---

[22] Instructions, Official Form B 7 [Statement of Financial Affairs] (available at http://www.uscourts.gov/forms/bankruptcy-forms/statement-financial-affairs). Official Form B 7 became effective April 1, 2013 and was superseded by Official Form B 107 on December 1, 2015. Thus, it is the Instructions to Form B 7 that are applicable to Ward's SOFA and Amended SOFA.

to the Tax Code for assistance.  *See, e.g., Cadle Co. v. King (In re King),* 272 B.R. 281, 292 (Bankr. N.D. Okla. 2002) (holding the Tax Code's definition of "gross income" is used to determine what gross income must be disclosed by a Chapter 7 debtor in his Statement of Financial Affairs); *see also In re Wagner*, 808 F.2d 542, 549 (7th Cir. 1986) (holding that, for purposes of Bankruptcy Code provision defining "farmer" exempt from involuntary bankruptcy as one who receives more than 80% of his "gross income" from farming operations, the term "gross income" is to be given the meaning under the Tax Code).  The Court agrees that the term "gross amount of income," as used in Statement of Financial Affairs Item 1, should be interpreted consistently with the definition of "gross income" found in the Tax Code.

The Tax Code broadly defines "gross income" as "all income from whatever source derived" including, but not limited to, an itemized list that includes items such as "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items," gross income derived from business, and dividends.  26 U.S.C. § 61(a).  Notably, the Tax Code is not the only source that broadly defines "gross income."  For example, Black's Law Dictionary defines "gross income" as the "[t]otal income from all sources before deductions, exemptions, or other tax reductions.  *See* IRC (26 USCA) § 61."  Black's Law Dictionary 881 (10th ed. 2014).  With the Tax Code's broad definition of "gross income" in mind, the Court will analyze the amounts disclosed in both Ward's SOFA and Amended SOFA.

Beginning with the SOFA generally, Ward initially only disclosed "wages," which he testified means actual wages and does not include any type of non-wage distribution from his companies. Tr. Trans. 12/12/16 at 245:1-19 (Ward).  SOFA Item 1, however, does not request "wages," it requests the "gross amount of income."  And, as discussed above, gross income is commonly defined to include far more than just wages earned.  The Court finds that Ward, a lawyer

and sophisticated businessman who has run multiple companies for many years, was undoubtedly aware of this distinction. Despite this, Ward chose to limit his initial disclosure to exclude substantial expenses paid on his behalf by entities he controlled, which creditors later learned was not less than $50,000 per year (and likely more). Although the Amended SOFA attempts to correct this omission, the amendment was filed nearly nine months into the Case and only after significant discovery had occurred and it was clear that the Judgment Creditors were going to aggressively pursue collection of the Judgment as permitted under the Bankruptcy Code. Thus, under the facts of this Case, the Court finds that Ward's Amended SOFA does not negate the false oath that Ward made in his SOFA. *In re Duncan*, 562 F.3d at 695. Accordingly, the Court finds that Ward misstated his gross income for each of 2012, 2013, and 2014 (YTD) on his SOFA by intentionally failing to disclose significant expenses paid on his behalf by companies he controlled.

Turning to the Amended SOFA, the Court will begin its analysis with 2014 and work back. As reflected on the SOFA and Amended SOFA, 2014 is unique in that it is only a partial year. This is important because the other information in the record that relates to Ward's income, such as tax returns showing officer compensation, are kept on an annual basis. Because of this, the Court is unable to tell, based upon the record before it, whether Ward accurately disclosed his year-to-date 2014 income in his Amended SOFA. Thus, the Court finds that the Plaintiffs have failed to meet their burden of proof with respect to their allegation that Ward gave a false oath by materially understating his 2014 gross income listed in the Amended SOFA.

The Plaintiffs have similarly failed to meet their burden with respect to their allegation that Ward materially understated his 2013 gross income in his Amended SOFA, as the Court will explain. For 2013, Ward's SOFA disclosed gross income of $41,180.11, while his Amended SOFA increased this amount to $91,180.11 ($41,180.11 + $50,000). The only evidence in the

record against which to assess the accuracy of this disclosed amount is the tax returns and bank records for various Ward-related entities. As for the tax returns, only a single return—that of Lloyd Ward & Associates, P.C. (of which Ward was the sole officer)—shows compensation paid to officers in 2013, totaling $13,907. PX 72 at 00151; Tr. Trans. 12/12/16 at 240:5-10 (Ward).

Turning to the bank statements, the record reflects that VL Capital paid $48,474.32 in expenses on Ward's behalf in 2013:[23]

| Date | Amount | To | For | PX 25 Bates Number & Transcript Citation |
|---|---|---|---|---|
| 1/3/2013 | $8,538.55 | University of Arkansas | Son's Tuition | 1455; Tr. Trans. 12/12/16 at 89:3-14; Tr. Trans. 12/13/16 at 25:15-26:10[24] |
| 1/7/2013 | $2,871.00 | Bear Creek Dentistry | Children's Dentist | 1456; Tr. Trans. 12/13/16 at 23:21-23, 40:23-25 |
| 1/15/2013 | $1,314.00 | Farmers Life Insurance | | 1456; Tr. Trans. 12/12/16 at 90:5-7; Tr. Trans. 12/13/16 at 24:24-25:2 |
| 1/28/2013 | $778.77 | University of Arkansas | Son's Tuition | 1455 |
| 1/28/2013 | $107.50 | Highland Park United Methodist Church ("HPUMC") | Church Tithes or Camp | 1456 |
| 1/30/2013 | $3,500.00 | Nordstrom | Payment on Account | 1456; Tr. Trans. 12/12/16 at 90:21-23; Tr. Trans. 12/13/16 at 27:9-15 |

---

[23] In the Plaintiffs' Proposed Findings of Fact and Conclusions of Law [AP ECF No. 141], the Plaintiffs attempt to charge Ward with $136,474.32 in income for expenses that VL Capital allegedly paid on his behalf in 2013. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 10-11. In reaching its figure of $48,474.32, however, the Court excluded certain expenses that it finds are not properly included in Ward's 2013 income based upon the record before it. These expenses include (i) $52,000 paid to maintain and improve the Residence, and (ii) $36,000 in legal fees paid to attorney Chris Weil. As to the Residence, the record shows that it is owned by GPC, a company that is owned by Amanda and that appears on Amended Schedule B as her sole management community property. Further, as previously determined in the GPC Adversary, Ward and GPC are not alter egos and GPC's assets are not property of Ward's bankruptcy estate. Thus, based upon this record, it would be inappropriate to consider amounts paid to maintain and improve the Residence as income to Ward. As to the legal fees, Ward testified that Weil represented (i) Ward, Lloyd Ward & Associates, P.C., and Lloyd Ward Group, P.C. in litigation involving Mike Miles (*see* pp. 53-54, *infra*), (ii) Lloyd Ward & Associates, P.C. and "other entities" in litigation against the Better Business Bureau, and (iii) Ward personally in a grievance action before the Texas State Bar. Tr. Trans. 12/13/16 at 29:3-7 (Ward); Tr. Trans. 12/14/16 at 94:10-95:8 (Ward). Although the Court believes that a portion of the $36,000 paid in legal fees is allocable to Ward as income, particularly fees associated with the State Bar grievance, the Court is unable to allocate the fees among the various defendants and lawsuits based on the very limited record on this subject established at trial. Thus, on this record, the Court finds that $48,474.32 in expenses were paid by VL Capital on Ward's behalf in 2013.

[24] Testimony given on December 12th was by Amanda, and testimony given on December 13th was by Ward.

| Date | Amount | To | For | PX 25 Bates Number & Transcript Citation |
|---|---|---|---|---|
| 2/19/2013 | $4,302.00 | Our Redeemer Lutheran School | Son's Tuition | 1453; Tr. Trans. 12/12/16 at 88:5-9 |
| 2/20/2013 | $4,000.00 | Lloyd Ward | | 1453; Tr. Trans. 12/12/16 at 88:15-17 |
| 2/22/2013 | $1,300.00 | Young's Upholstery | | 1453; Tr. Trans. 12/13/16 at 27:1-5 |
| 2/25/2013 | $3,500.00 | Nordstrom | Payment on Account | 1453; Tr. Trans. 12/12/16 at 88:10-14 |
| 2/26/2013 | $2,500.00 | Lloyd Ward | | 1453; Tr. Trans. 12/12/16 at 88:18-21 |
| 2/27/2013 | $1,950.00 | World Upholstery | | 1453; Tr. Trans. 12/13/16 at 26:17-27:2 |
| 3/1/2013 | $300.00 | HPUMC | Church Tithes or Camp | 1450; Tr. Trans. 12/12/16 at 86:25-87:5 |
| 3/12/2013 | $12,100.00 | Lloyd Ward | | 1450; Tr. Trans. 12/12/16 at 85:22-24; Tr. Trans. 12/13/16 at 28:21-22 |
| 3/19/2013 | $50.00 | Northwood Country Club | | 1450; Tr. Trans. 12/13/16 at 28:18-20 |
| 3/28/2013 | $762.50 | USAA Life Insurance | | 1450; Tr. Trans. 12/12/16 at 87:17-19 |
| 4/16/2013 | $350.00 | Northwood Country Club | | 1447 |
| 5/23/2013 | $250.00 | HPUMC | Church Tithes or Camp | 1444; Tr. Trans. 12/12/16 at 84:10-85:3 |
| 2013 Total | $48,474.32 | | | |

This evidence establishes total compensation to Ward of $62,381.32 for 2013, calculated as $13,907 of compensation from Lloyd Ward & Associates, P.C. plus $48,474.32 of expenses paid on his behalf by VL Capital.

Additionally, Ward's personal bank records show that deposits into his personal account ending in x8076 totaled at least $137,428.93 for 2013:

| Month Ending | Deposits (Acct. x8076) | PX 15 Bates Number |
|---|---|---|
| 10/17/13 | $7,060.00 | First Community Bank 4 |
| 9/18/13 | $10,766.89 | First Community Bank 9 |

| Month Ending | Deposits (Acct. x8076) | PX 15 Bates Number |
|---|---|---|
| 8/16/13 | $10,612.13 | First Community Bank 19 |
| 7/17/13 | $33,513.66 | First Community Bank 24 |
| 6/18/13 | $19,565.00 | First Community Bank 29 |
| 5/16/13 | $24,163.66 | First Community Bank 34 |
| 4/16/13 | $10,213.66 | First Community Bank 38 |
| 3/18/13 | $3,900.00 | First Community Bank 41 |
| 2/19/13 | $16,200.00 | First Community Bank 44 |
| 1/17/13 | $1,433.93 | First Community Bank 49 |
| 2013 Total: | $137,428.93 | |

Although the amount of these deposits raises questions regarding the amount of Ward's actual gross income in 2013, the evidentiary record is insufficient for the Court to determine where the deposits came from, what they were for, and whether they represent income to Ward.[25]

Thus, for 2013, the Court can only reliably calculate $62,381.32 of income to Ward, which is less than the $91,180.11 disclosed on Ward's Amended SOFA. Accordingly, the Court finds that the Plaintiffs have failed to meet their burden to prove that Ward understated his 2013 gross income on his Amended SOFA.

The Plaintiffs, however, have carried their burden of proof that Ward understated his gross income in 2012 in both his SOFA and Amended SOFA, as the Court will explain in turn. With respect to the SOFA, Ward testified at trial that he was the sole officer of each of Lloyd Ward, P.C. and Lloyd Ward & Associates, P.C. Tr. Trans. 12/12/16 at 239:18-241:10 (Ward). The 2012 tax return of Lloyd Ward, P.C. shows that it paid officer compensation of $39,000 that year. PX 74 at 00336 (line 7). The 2012 tax return for Lloyd Ward & Associates, P.C. also shows that it

---

[25] Certain deposit information was redacted from PX 15. Even when deposit information was not redacted, it was still insufficient for the Court to determine whether the deposits represented income to Ward.

paid officer compensation of $39,000 that year. PX 72 at 00145 (line 7). Thus, based on the tax returns in evidence that were filed by entities of which Ward is the sole officer, Ward received compensation of $78,000 in 2012. This amount is nearly double the $42,271.50 in "wages" disclosed in Ward's SOFA. DX 3 at 29 of 56; DX 18 at 1; Tr. Trans. 12/12/16 at 254:3-8 (Ward), 256:14-19 (Ward). When questioned about the discrepancy, Ward testified that he did not believe the $78,000 figure was accurate, though he did not explain why. Tr. Trans. 12/12/16 at 256:20-259:5 (Ward). Ward also testified that the entities would not file false tax returns. *Id.* at 257:22-23 (Ward). The Court is satisfied that the entities paid Ward the amount of compensation shown on the tax returns. Thus, the Court finds that Ward materially understated his 2012 income in his SOFA.

Ward's Amended SOFA, which disclosed an additional $60,000 in gross income for 2012, does not address his failure to disclose the $78,000 of officer compensation just discussed. First, the additional $60,000 is labelled, "[c]ompany distributions/ expense payments" and not "wages." Thus, it is clear based on the face of the Amended SOFA, and Ward's own testimony, that the additional amounts are not officer compensation, but either company distributions made to Ward as a shareholder or expenses paid on Ward's behalf. Tr. Trans. 12/12/16 at 245:5-8 (Ward) (testifying that the $42,271.50 was "wages, not wages and distributions"), 246:7-11 (Ward) (testifying that the additional $60,000 was company distributions and expense payments). Thus, it appears that the material misstatement regarding the amount of Ward's 2013 "wages" made in the SOFA was carried over into the Amended SOFA.

Second, even if the Court were to combine the amounts disclosed, for aggregate gross income of $102,271.50 ($42,271.50 + $60,000), the record clearly reflects that Ward still materially understated his 2012 income. In addition to the $78,000 in officer compensation

discussed above, the record shows that Ward's entities paid far more than $60,000 in expenses on his behalf. For example, in 2012, money in a bank account titled in the name Lloyd Ward Group PC II was used to pay $32,749.11 of expenses on Ward's behalf:

| Date | Amount | To | For | PX 10 Bates Number |
|---|---|---|---|---|
| 5/14/2012 | $1,894.38 | David Yurman | | BOA 1998-0045 |
| 5/22/2012 | $5,003.39 | Expedia | Airfare to Paris | BOA 1998-0045 |
| 6/8/2012 | $198.19 | Inn at Carnal Hall | Ward CLE[26] | BOA 1998-0049 |
| 6/8/2012 | $169.88 | Inn at Carnal Hall | Ward CLE | BOA 1998-0049 |
| 6/11/2012 | $225.37 | Inn at Carnal Hall | Ward CLE | BOA 1998-0049 |
| 6/11/2012 | $169.88 | Inn at Carnal Hall | Ward CLE | BOA 1998-0049 |
| 6/18/2012 | $4,330.00 | Bachendorf's Jewelers | | BOA 1998-0049 |
| 6/26/2012 | $460.00 | BMW of Dallas | | BOA 1998-0049 |
| 7/2/2012 | $715.00 | Park Place Motors | Servicing Mercedes | BOA 1998-0053 |
| 7/16/2012 | $333.36 | Quaibranly | Paris Vacation[27] | BOA 1998-0053 |
| 7/17/2012 | $2,937.29 | Montblanc | Paris Vacation | BOA 1998-0053 |
| 7/19/2012 | $221.51 | Dark Rome Ltd Euro | Paris Vacation | BOA 1998-0053 |
| 7/20/2012 | $139.23 | Fouquet | Paris Vacation | BOA 1998-0053 |
| 7/20/2012 | $120.75 | Club Argentina | Paris Vacation | BOA 1998-0053 |
| 7/20/2012 | $112.98 | Zara Camps Ely | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $573.19 | Montaigne | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $508.28 | Le Lido | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $324.56 | Louis Vuitton | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $17.15 | Place Du Marche | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $16.53 | Café Select | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $9.06 | Place Du Marche | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $7.23 | Place Du Marche | Paris Vacation | BOA 1998-0053 |
| 7/23/2012 | $4.53 | Place Du Marche | Paris Vacation | BOA 1998-0053 |
| 8/6/2012 | $4,654.75 | David Yurman | | BOA 1998-0057 |
| 8/20/2012 | $248.02 | Inn at Carnal Hall | Ward CLE | BOA 1998-0057 |
| 9/4/2012 | $617.03 | Cartier Dallas | | BOA 1998-0061 |
| 9/4/2012 | $449.24 | Cartier Dallas | | BOA 1998-0061 |

---

[26] Ward testified that the payments to the Inn at Carnal Hall were for his personal continuing legal education. Tr. Trans. 12/13/16 at 80:2-10 (Ward).

[27] In the summer of 2012, the Wards took a trip to Paris with their children. Tr. Trans. 12/16/16 at 73:22-74:3 (Amanda). This was a family vacation, not a business trip. *Id.* at 74:4-7 (Amanda). They shopped at stores including Montblanc and Luis Vuitton, where they purchased a scarf for Amanda. *Id.* at 74:8-21 (Amanda).

| Date | Amount | To | For | PX 10 Bates Number |
|---|---|---|---|---|
| 10/9/2012 | $195.00 | Young Actors Studio | | BOA 1998-0065 |
| 10/15/2012 | $2,760.38 | David Yurman | | BOA 1998-0065 |
| 10/15/2012 | $2,304.94 | Twin City Gold | | BOA 1998-0065 |
| 10/25/2012 | $990.49 | Bachendorf's Jewelers | | BOA 1998-0065 |
| 11/15/2012 | $1,962.52 | Park Place Motors Svc. | Servicing Mercedes | BOA 1998-0069 |
| 12/3/2012 | $75.00 | Xstream Auto Clean | | BOA 1998-0073 |
| 2012 Total | $32,749.11 | | | |

There were also at least $30,934 in cash withdrawals from the Lloyd Ward Group PC II account in 2012:

| Date | Amount | At | PX 10 Bates Number |
|---|---|---|---|
| 3/7/2012 | $200.00 | Bank of America | BOA 1998-0037 |
| 3/26/2012 | $301.75 | Walmart | BOA 1998-0037 |
| 3/29/2012 | $503.00 | First Community Bank | BOA 1998-0037 |
| 4/2/2012 | $503.00 | Wells Fargo | BOA 1998-0041 |
| 4/5/2012 | $503.00 | Comerica Bank | BOA 1998-0041 |
| 4/9/2012 | $504.00 | Compass Bank | BOA 1998-0041 |
| 4/12/2012 | $500.00 | Bank of America | BOA 1998-0041 |
| 4/16/2012 | $500.00 | Bank of America | BOA 1998-0041 |
| 4/17/2012 | $504.00 | Compass Bank | BOA 1998-0041 |
| 4/20/2012 | $500.00 | Bank of America | BOA 1998-0041 |
| 4/24/2012 | $1,000.00 | Cash Withdrawal | BOA 1998-0041 |
| 5/4/2012 | $500.00 | Bank of America | BOA 1998-0045 |
| 5/7/2012 | $500.00 | Bank of America | BOA 1998-0045 |
| 5/7/2012 | $500.00 | Bank of America | BOA 1998-0045 |
| 5/14/2012 | $503.00 | CT Travelex | BOA 1998-0045 |
| 5/17/2012 | $500.00 | Bank of America | BOA 1998-0045 |
| 5/21/2012 | $500.00 | Bank of America | BOA 1998-0045 |
| 5/29/2012 | $500.00 | Bank of America | BOA 1998-0045 |
| 6/4/2012 | $500.00 | Bank of America | BOA 1998-0049 |
| 6/4/2012 | $500.00 | Bank of America | BOA 1998-0049 |
| 6/11/2012 | $500.00 | Bank of America | BOA 1998-0049 |
| 6/11/2012 | $500.00 | Bank of America | BOA 1998-0049 |
| 6/15/2012 | $500.00 | Bank of America | BOA 1998-0049 |
| 6/18/2012 | $500.00 | Bank of America | BOA 1998-0049 |

**MEMORANDUM OPINION** 32

| Date | Amount | At | PX 10 Bates Number |
|---|---|---|---|
| 6/21/2012 | $500.00 | Bank of America | BOA 1998-0049 |
| 7/2/2012 | $503.00 | Comerica Bank | BOA 1998-0053 |
| 7/2/2012 | $500.00 | Bank of America | BOA 1998-0053 |
| 7/3/2012 | $503.00 | Comerica Bank | BOA 1998-0053 |
| 7/9/2012 | $500.00 | Bank of America | BOA 1998-0053 |
| 7/23/2012 | $489.91 | BNP | BOA 1998-0053 |
| 8/6/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 8/6/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 8/8/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 8/9/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 8/10/2012 | $203.00 | CT Travelex | BOA 1998-0057 |
| 8/17/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 8/24/2012 | $503.00 | First Community Bank | BOA 1998-0057 |
| 8/27/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 8/29/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 8/31/2012 | $500.00 | Bank of America | BOA 1998-0057 |
| 9/5/2012 | $302.50 | 7-11 | BOA 1998-0061 |
| 9/10/2012 | $500.00 | Bank of America | BOA 1998-0061 |
| 9/17/2012 | $500.00 | Bank of America | BOA 1998-0061 |
| 9/27/2012 | $500.00 | Bank of America | BOA 1998-0061 |
| 10/4/2012 | $2,500.00 | Cash | BOA 1998-0065 |
| 10/1/2012 | $500.00 | Bank of America | BOA 1998-0065 |
| 10/9/2012 | $500.00 | Bank of America | BOA 1998-0065 |
| 10/22/2012 | $400.00 | Bank of America | BOA 1998-0065 |
| 10/26/2012 | $500.00 | Bank of America | BOA 1998-0065 |
| 10/29/2012 | $500.00 | Bank of America | BOA 1998-0065 |
| 11/29/2012 | $1,500.00 | Cash | BOA 1998-0069 |
| 11/5/2012 | $500.00 | Bank of America | BOA 1998-0069 |
| 11/7/2012 | $303.00 | First Community Bank | BOA 1998-0069 |
| 11/9/2012 | $500.00 | Bank of America | BOA 1998-0069 |
| 11/15/2012 | $400.00 | Bank of America | BOA 1998-0069 |
| 11/15/2012 | $201.75 | Quick Stop | BOA 1998-0069 |
| 11/19/2012 | $300.00 | Bank of America | BOA 1998-0070 |
| 11/30/2012 | $400.00 | Bank of America | BOA 1998-0070 |
| 12/17/2012 | $403.00 | CT Travelex | BOA 1998-0073 |
| 2012 Total | $30,934.00 | | |

**MEMORANDUM OPINION**

Although Ward testified that be believed Robert Pendergrast (alleged CFO of Lloyd Ward Group, P.C., at least for a time) was also on this account and could have made those withdrawals, Ward was unable to recall the dates that Pendergrast was on the account and whether Pendergrast, in fact, made any ATM withdrawals from the account. Tr. Trans. 12/13/16 at 80:11-17 (Ward); Tr. Trans. 12/12/16 at 268:6-25 (Ward). Without documentary evidence or corroborating testimony, the Court does not find Ward's testimony that Robert Pendergrast was on the account[28] and could have made the withdrawals credible. In fact, as explained throughout this Memorandum Opinion, Ward's testimony at trial often evolved (or outright changed) depending on the documentary evidence he was confronted with. Almost without exception, the Court found Ward's trial testimony to be purposefully vague, self-serving, and simply not credible.[29]

Further, during 2012, VL Capital paid $18,009.91 in either cash directly to Ward or for expenses paid on Ward's behalf:

| Date | Amount | To | For | PX 25 Bates Number & Transcript Citation |
|------|--------|----|----|------------------------------------------|
| 12/31/2012 | $1,000.00 | Lloyd Ward | | 1459; Tr. Trans. 12/13/16 at 22:6-8[30] |
| 11/20/2012 | $57.91 | Parker School Uniforms | School Uniforms | 1462; Tr. Trans. 12/12/16 at 92:11-14; Tr. Trans. 12/13/16 at 21:7-10 |
| 11/29/2012 | $4,500.00 | Lloyd Ward | | 1462; Tr. Trans. 12/13/16 at 92:15-19 |
| 10/22/2012 | $300.00 | Munger Place Church | Church Tithes | 1465; Tr. Trans. 12/13/16 at 93:10-19 |
| 10/24/2012 | $150.00 | Shana Anderson | Daughter's Pictures | 1465; Tr. Trans. 12/12/16 at 94:21-24 |
| 10/31/2012 | $700.00 | Neiman Marcus | Payment on Account | 1465; Tr. Trans. 12/13/16 at 94:6-9 |
| 10/29/2012 | $2,000.00 | Lloyd Ward | | 1465 |

---

[28] The records at PX 10 show that, in 2012, Lloyd Ward Group, PC II's bank statements were mailed to "The Lloyd Ward Group, PC II, Attn: Albert Predergast or Lloyd Ward." Even if this Court were to assume that Albert Predergast and Robert Pendergrast were the same person (though the record is silent on that point), there is still nothing in the record indicating that Pendergrast had signatory authority on the account.

[29] The exceptions generally involved instances when documentary evidence corroborated his oral testimony.

[30] Testimony given on December 12th was by Amanda, and testimony given on December 13th was by Ward.

| Date | Amount | To | For | PX 25 Bates Number & Transcript Citation |
|---|---|---|---|---|
| 9/21/2012 | $4,302.00 | Our Redeemer Lutheran School | Son's Tuition | 1468; Tr. Trans. 12/12/16 at 94:24-95:5 |
| 7/16/2012 | $5,000.00 | Lloyd Ward | | 1474 |
| 2012 Total | $18,009.91 | | | |

Thus, it appears that Ward's gross income in 2012 was at least $159,693.02,[31] far more than the $102,271.50 in wages and distributions disclosed on his Amended SOFA.[32] Even if the cash withdrawals from the Lloyd Ward, P.C. II account were excluded as having potentially been made by Robert Pendergrast (which the Court does not believe), Ward's gross income for 2012 would still total $128,759.02, an amount materially higher than what Ward disclosed. Accordingly, the Court finds that Ward materially misstated his gross income for 2012 on his Amended SOFA.

Based upon this record, there is no question that the first three and the fifth elements of a § 727(a)(4) claim are satisfied here. Ward filed his SOFA and Amended SOFA under penalty of perjury, and the misrepresentations regarding his income appear on both. Moreover, Ward's statements regarding his gross income were not only clearly false, but also material to the Case because his income bears a direct relationship to his estate and concerns the discovery of assets, Ward's business dealings, and the existence and disposition of his property. Also, based upon the

---

[31] Calculated as $78,000 in officer compensation + $32,749.11 in expenses paid from Lloyd Ward PC II Account + $30,934 in cash withdrawn from Lloyd Ward PC II Account + $18,009.91 in expenses paid by VL Capital.

[32] The Court also found notable the volume of money flowing from Lloyd Ward Group, P.C. into Ward's personal account in 2012. Plaintiffs' Exhibit 202 (excluding Pyke 0000190, which was not admitted into evidence) is a General Ledger for Lloyd Ward Group, P.C., which shows that distributions from that entity alone into Ward's personal account totaled at least $222,200 for 2012 (far exceeding any amounts disclosed). *See* PX 202 (transfers to Ward are into the account ending in x8076); Tr. Trans. 12/14/16 at 54:12-57:23 (Ward testifying regarding certain of the transfers and agreeing to the total of $222,200). The record, however, does not disclose why these funds were transferred nor their purpose. Thus, the Court did not include the $222,200 in its computation of Ward's income for 2012.

**MEMORANDUM OPINION** 35

record before it, the Court finds that Ward knew these statements were false. This leaves only the fourth element—*i.e.*, that Ward made the statements with fraudulent intent.

Here, the Court is satisfied that Ward made the statements regarding the amount of his gross income with fraudulent intent. Although there is no evidence explaining how Ward calculated the gross income information included in his SOFA and Amended SOFA, two things are clear. First, Ward only included "wages" in his SOFA, despite the clear language of SOFA Item 1 that asks for disclosure of a debtor's gross income. DX 3 at 29 of 56 (compare SOFA Item 1, which calls for "the gross amount of income" with Ward's answer that is designated as "wages"). Ward's choice to limit expressly his gross income to "wages" is important because Ward is both a lawyer and a sophisticated businessman, having run multiple businesses over many years with significant business operations. Considering Ward's level of sophistication, the only logical conclusion this Court can draw is that Ward's decision to only disclose his "wages" was intentional and strategic; and, by doing so, he intended to mislead his creditors. Nearly nine months later, Ward amended his SOFA to include additional income he received, but only after it was obvious (at least to the Court) that the Judgment Creditors intended to attempt to prevent their debt from being discharged by Ward in the Case—either by having the Judgment excepted from Ward's discharge or by having Ward's discharge denied outright. Notwithstanding the fact that it was clear that litigation over Ward's discharge was likely, Ward again materially understated his gross income for 2012 in his Amended SOFA. Ward's purposeful and continuing misstatements regarding his gross income, coupled with the other false oaths discussed below, show a clear pattern of reckless disregard for the truth that this Court finds is sufficient to prove fraudulent intent. *In re Duncan*, 562 F.3d at 695.

Thus, for the reasons explained above, the Court concludes that Ward's receipt of a discharge must be denied under 11 U.S.C. § 727(a)(4)(A) due to the multiple false oaths regarding his gross income contained in his SOFA and Amended SOFA.

> **b)** **Ward Misrepresented His Income on Schedule I and His Wife's Income on Schedule I and Amended Schedule I.**

A debtor's bankruptcy Schedules are another key source of information that creditors may review to ascertain a debtor's financial position. Included within these is Schedule I, titled "Your Income," which requires a debtor to provide current employment and income information. Part 2 of Schedule I asks the debtor to "[e]stimate monthly income as of the date you file this form" and lists various categories of income for the debtor to consider and, if applicable, disclose. To the extent a debtor receives income that does not fit into the stated categories, Item 8h is a catchall that asks the debtor to list "[o]ther monthly income." As part of his disclosures, the debtor is also required to calculate his gross income and his "total monthly take-home pay." If the debtor is married, this information is to be provided separately for both the debtor and his spouse. *See, e.g.,* DX 16 at 11-12 of 16. With this basic background in mind, the Court will turn to Ward's disclosures.

In Schedule I, Ward swore that he made $2,000 per month in gross income. DX 3 at 25 of 56 (Item 4). After subtracting the various deduction items specified on Schedule I, Ward swore that he had net monthly income of $1,816.16. *Id.* at 26 of 56 (Item 10). For Amanda, he disclosed $2,200 per month in gross income and $1,653.26 per month of net income. *Id.* at 25 of 56 (Item 4) and 26 of 56 (Item 10). Ward filed his Amended Schedules nearly nine months later, on January 23, 2015. Although his and Amanda's gross income figures reflected in Item 4 remained unchanged, Ward added an additional $6,000 per month in response to the catchall provision of Item 8h, which Ward described as "company distributions." DX 16 at 12 of 16 (Item 8h). As

stipulated to by the parties, the $6,000 per month "represents Lloyd Ward & Associates, PC's payment of Ward's personal expenses." Joint Pretrial Order at 10 (Stipulated Fact No. 36). For the reasons explained below, the Court finds that the income disclosed on Schedule I for (i) Amanda in both the Schedules and the Amended Schedules, and (ii) Ward in the Schedules, is false.

As explained below, the record does not contain concise information regarding Amanda's gross income as of the Petition Date (May 1, 2014, the same day Ward filed his Schedules). Instead, the Court received conflicting testimony and evidence regarding Amanda's *net* income at various times before and immediately after the Petition Date. Despite this, the Court can narrow the amount of Amanda's *net* monthly income down to one of several alternatives, each of which, standing alone, is sufficient to prove by a preponderance of the evidence that Ward misstated Amanda's gross and net income on Schedule I. To explain this ruling, the Court must first explain how it determined Amanda's likely gross income as of the Petition Date.

Turning to the bank records in evidence, they show that Amanda received salary from two sources over time. Beginning at least as of January 13, 2012 through approximately September 2012, Amanda received a paycheck of $1,277.12 from Lloyd Ward & Associates, P.C. on approximately the first and fifteenth of each month (which the Court will refer to as bi-weekly). PX 43 at 000945, 949, 951, 953, 957, 961, 965, 965, 967. Beginning in October 2012 through December 31, 2012, Amanda received bi-weekly payroll checks from BRM (a company scheduled as Amanda's sole management community property) in an identical amount. *Id.* at 000969, 973, 977.[33] In January 2013, Amanda's payroll checks from BRM changed to $1,249.31 bi-weekly.[34]

---

[33] Once Amanda began receiving her paycheck from BRM, it appears that Lloyd Ward & Associates, P.C. no longer paid her a salary.

[34] Although the record provided no explanation, sometimes the bi-weekly deposit was $1,247.12. *See* PX 43 at 000981.

*Id.* at 000981, 984, 985, 989, 995, 999, 1001, 1004, 1005, 1007, 1009, 1013, 118, 1019, 1022, 1023, 1029, 1031, 1036, 1037, 1041, 1044. This amount increased slightly to $1,250.87 bi-weekly beginning in February 2014 through March 6, 2014. *Id.* at 001045, 1049, 1053. It then increased to $1,517.73 bi-weekly beginning March 13, 2014. *Id.* at 0001049, 1053, 1055, 1059. Although there appears to be a gap in the bank records, Amanda's salary increased to $2,716.66 bi-weekly sometime between April 15, 2014 and May 16, 2014 (the month spanning the Petition Date). *See* PX 58 at 003817, 3819, 3823.[35] Thus, based on the bank records, as of the Petition Date Amanda's net income was either $2,716.66 bi-weekly (or $5,433.32 per month) or, at the very least, $1,517.73 bi-weekly (or $3,035.46 per month). As previously explained, the above figures are net figures, and the Court could find no credible evidence in the record showing the amounts deducted from her gross income to result in the net income found above.

Moving on to Amanda's testimony regarding her income, she testified at a Bankruptcy Rule 2004 examination taken on February 2, 2015 that her then-present take home pay was $2,700 every two weeks and had been at that level for one year (or back to February 2, 2014). Tr. Trans. 12/12/16 at 40:17-42:10 (Amanda). At trial, however, Amanda testified that the $2,200 per month gross income figure in Schedule I was correct, despite her prior sworn testimony and her failure to correct that prior testimony. *Id.* at 44:17-46:8 (Amanda).[36] When further questioned, Amanda testified that from 2013 through the end of April 2014, her *net* "pay" was approximately $2,400 to $2,500 per month, or $1,249 per paycheck. *Id.* at 191:8-24 (Amanda). Not only does this

---

[35] The last payroll deposit into Amanda's account with Preston National Bank occurred on April 18. 2014 in the amount of $1,200.73. PX 43 at 001055. This reflected payroll of $1,517.73, minus $517 in cash withheld. *Id.* at 001059. The first payroll deposit into Amanda's account with Chase occurred on May 16, 2014 in the amount of $2,716.66. PX 58 at 003817; *see also id.* at 3819, 3823 (showing continuing payroll deposits of $2,716.66 every two weeks).

[36] Amanda appeared incredibly uncomfortable on the witness stand, frequently looking at her husband for guidance or encouragement. At best, Amanda appeared afraid to say anything that might hurt her husband or knowingly conflict with the documents he signed under penalty of perjury. Overall, the Court found her testimony to not be completely forthcoming and her testimony not credible unless supported by corroborating documentary evidence.

testimony directly conflict with her bank records discussed above, it is inconsistent with her testimony that Schedule I is correct.

Despite the lack of clarity as to Amanda's gross monthly income as of the Petition Date, the record is more than sufficient to show that Schedule I and Amended Schedule I are materially false under any alternative. Ward swore under penalty of perjury that his wife's *gross* monthly income was $2,200. To the contrary, Amanda's testimony (as construed most favorably to Ward) establishes that her *net* income was $2,400 to $2,500 monthly, and bank records admitted into evidence show that her monthly *net* income was more likely $3,035.46 or $5,433.32. Thus, under any of these alternatives, Ward's statements regarding Amanda's gross income on Schedule I and Amended Schedule I, which were made under penalty of perjury, are false.

Along these same lines, Schedule I and Amended Schedule I also misrepresent Amanda's net income as $1,653.26 per month. The evidence in the record establishes that Amanda's net income ranged from a minimum $2,400 per month up to $5,433.32 per month, each of which is materially higher than $1,653.26. Thus, Schedule I also materially misstates Amanda's net income.

Turning to Ward, it is undisputed that his entities paid significant expenses directly on his behalf (likely exceeding $50,000 per year). *See* pp. 23-37, *supra.* Despite this, Ward did not factor any of those payments (or estimated future payments) into his income figure reflected in Schedule I (Item 2). Instead, Ward chose to limit his disclosure to the $2,000 "payroll" amount allegedly provided to him by his accountant. Tr. Trans. 12/14/16 at 104:4-17 (Ward). Even if Ward did not believe that the expense reimbursements were part of his "gross wages, salary, and commissions" requested by Item 2 of Schedule I, the schedule goes on to list other forms of income a debtor is to disclose and contains a catchall for "[o]ther monthly income." *See, e.g.,* DX 3 at 26 of 56

(Schedule I, Item 8h). And, as explained above, expense reimbursements are clearly part of a debtor's gross income that must be disclosed on his bankruptcy filings. *See* pp. 24-25, *supra.* Although Ward ultimately added $6,000 per month to his Schedule I income (as reflected in Amended Schedule I), the Court finds that this amendment, which was made nine months into the Case and after it was clear that litigation over Ward's discharge and the dischargeability of the Judgment was likely, did not negate the false statement Ward made in Schedule I when he knowingly and intentionally underreported his current gross income. *In re Duncan*, 562 F.3d at 695.

Although the record does not contain sufficient information for this Court to verify whether the $6,000 figure is correct,[37] the amount is the subject of yet another false oath, to which the Court will now turn. In the Joint Pretrial Order, the parties stipulated that:

> Ward amended his Schedule I on January 23, 2015, to reflect additional income of $6,000 per month in the form of previously undisclosed "company distributions." These distributions represent Lloyd Ward & Associates, PC's payment of Ward's personal expenses.

Joint Pretrial Order at 10 (Joint Stipulation No. 36). The Joint Pretrial Order clearly states that Ward calculated the $6,000 figure based solely upon expenses that Lloyd Ward & Associates, P.C. paid on his behalf, which the record shows commonly occurred.

At trial, however, Ward testified that he calculated the $6,000 in a completely different way:

> I went back and looked to see every deposit that I had made over the time period - - or over the last 12 months, and averaged those, maybe six months. But I took the last six/nine months to look to see how much money had been put into the account over and above what my salary was. Did a weighted average on it, and put what the weighted average monthly was on it.

---

[37] At trial, Ward testified that First Community Bank Account No. x8076 was his "primary" and "personal" account. Tr. Trans. 12/13/16 at 163:2-7 (Ward); PX 15 (bank records). The latest bank record for that account, however, is for the period ending October 17, 2013, which is nearly seven months prior to the Petition Date. *See* PX 15 at 0004.

Tr. Trans. 12/14/16 at 105:19-25 (Ward). The Court then asked Ward to repeat his answer, and he again testified that:

> I added 8H, which is company distributions, which is on Page 12. And I went back over – I don't recall, it was like a six- or a nine-month time period, I looked to see what deposits over and above salary would have gone into my account. And then I simply added it, divided it by either six or nine, and rounded the number, which came out to be [$]6,000, for what the average for distributions would have been.

*Id.* at 106:10-17 (Ward). Thus, at trial, Ward testified that he calculated the $6,000 figure based upon expenses reimbursed to him as reflected in deposits made into his personal account.

The calculation methods contained in the Joint Pretrial Order and as testified to by Ward at trial cannot both be correct, as the former describes Lloyd Ward & Associates, P.C. directly paying Ward's expenses, while the latter describes reimbursement to Ward of expenses he personally paid. Although this discrepancy could arguably be the result of counsel's failure to use precise language in the Joint Pretrial Order, the Court finds that is not the case here based upon Ward's gross carelessness in preparing the documents filed with the Court and his serial false oaths described throughout this Memorandum Opinion. Moreover, not only was Ward represented by a lawyer, he is a lawyer and is aware of both the consequences of including a stipulation in a pretrial order presented to the Court and of giving a false oath. For these reasons, the Court will hold Ward to the stipulation in the Joint Pretrial Order, and finds that Ward falsely testified at trial when describing how he calculated the $6,000 figure.

Based upon this record, there is no question that the elements of a § 727(a)(4) claim are satisfied here. Ward filed his Schedule I and Amended Schedule I under penalty of perjury. The false statements regarding Amanda's income appear on both documents, while the false statements regarding Ward's income (i) appear on Schedule I, and (ii) were made by Ward at trial. These statements were not only clearly false, but also material to the Case because the documents and testimony disclosing Ward's and Amanda's income bear a direct relationship to Ward's estate,

**MEMORANDUM OPINION** 42

while the statements and testimony regarding Ward's income also concern the discovery of assets, Ward's business dealings, and/or the existence and disposition of his property. Also, based upon this evidentiary record, the Court finds that Ward was undoubtedly aware that both (i) the amounts listed for his and Amanda's income, and (ii) his testimony regarding calculation of the $6,000 he added to Amended I were false.

The Court is also satisfied that Ward made the statements regarding his and Amanda's income with fraudulent intent because, at a minimum, of Ward's reckless disregard for the truth that he showed in preparing Schedule I and Amended Schedule I. For example, when asked at trial how he determined the income shown on his Schedules, Ward testified that he asked the accountant to his various entities and BRM what he and Amanda's monthly "payroll" was. Tr. Trans. 12/14/16 at 104:6-23 (Ward) (Q: "And so let's look at the – Line 2 of Part 2 where it requires your gross wages, salary, and commissions. Can you tell me what you did to ascertain that—the amount for you, Debtor 1?" A: "Yeah." Q: "Is that for your or your wife, Debtor 1?" A: "1 is myself." Q; "And what does that reflect?" A: "That was what I was on ADP payroll for. I went to Pat [the accountant] and I said, 'Pat, what's my monthly payroll?' It is asking for gross wages, salary, and commission, and [I] asked her what I was on the payroll for at that time."). That was all Ward did despite his knowledge that his entities directly paid upwards of $50,000 per year in his personal expenses.

Even when Ward amended Schedule I nearly nine months into the Case purportedly to account for the payment of his expenses by entities he controls, he testified that he only looked at his personal bank statements to determine expenses reimbursed to him. Tr. Trans. 12/14/16 at 105:14-106:25 (Ward). Ward, however, had previously stipulated in the Joint Pretrial Order that he calculated the $6,000 based upon expenses paid directly on his behalf. This is yet another

example of Ward's reckless disregard for the truth when preparing his Schedules and Amended Schedules.

Thus, for the reasons explained above, the Court concludes that Ward's receipt of a discharge must be denied under 11 U.S.C. § 727(a)(4)(A) due to the false oaths (i) contained in his Schedule I and Amended Schedule I regarding Amanda's income, (ii) the false oath in Schedule I regarding his income, and (iii) the false oath made at trial when Ward testified as to how the $6,000 added to Amended Schedule I was calculated.

> ### c) Ward Testified Falsely Regarding the Circumstances Surrounding the Purchase of the Vehicles Listed in his Schedule B and Amended Schedule B.

Pursuant to § 341 of the Bankruptcy Code, "[w]ithin a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors. 11 U.S.C. § 341(a). The § 341 meeting is typically held after a debtor files his Schedules and Statement of Financial Affairs and is an opportunity for parties in interest to question a debtor, *under oath*, regarding his financial condition. As previously explained, Ward's § 341 meeting was held and concluded on July 22, 2014. Joint Pretrial Order at 6 (Stipulated Fact No. 11).

As will be explained below, Ward gave false testimony at his § 341 meeting and at trial regarding the purchase of two vehicles listed on his Schedule B and Amended Schedule B—(i) a 2011 Mercedes Benz GL450 that Ward lists as his property, and (ii) a 2011 BMW 328 that is described as "Wife's sole management community property, identified herein for disclosure purposes only." DX 3 at 10 of 56 (Item 25); DX 16 at 5 of 16 (Item 25).

During Ward's § 341 meeting, he testified that, in 2011, he traded a 1999 Porsche 911 and a 1995 Porsche 928 in for the Mercedes GL. Tr. Trans. 12/13/16 at 98:8-99:15 (Ward). At trial, however, Ward testified that he sold the Porsche 911 and the Porsche 928 on consignment to raise funds to purchase the 2011 BMW. *Id.* at 98:8-16 (Ward). The documentary evidence, however,

**MEMORANDUM OPINION**                                                                                           **44**

gives a third version of the transaction. It shows that VL Capital paid $48,053.94 for the purchase

of the BMW.  See PX 98 (Texas Certificate of Title dated October 12, 2011 showing the BMW

was purchased from Classic BMW of Plano); PX 28 at First Community Bank 01905 ($48,053.94

wire from VL Capital to Classic BMW on September 20, 2011); Tr. Trans. 12/12/16 at 176:7-

178:18 (Amanda).  Instead of using the funds generated from the consignment/sale as Ward

previously testified, he deposited the funds into his personal account in February 2012.  See PX

42 at Preston Nat'l 00805 (deposit slip and copies of checks); Tr. Trans. 12/13/16 at 107:8-25

(Ward).  Ultimately, Ward admitted that he did not trade either Porsche in on the Mercedes or the

BMW and the funds generated from the sale of the Porsches were deposited into his personal

account. *Id.*

Based upon this record, there is no question that the elements of a § 727(a)(4) claim are

satisfied here.  Ward clearly gave knowingly false testimony at both the § 341 meeting and at the

trial regarding the disposition of the Porsches and his use of the sale proceeds.  The statements

were not only false, but they were material to the Case because the testimony bears a direct

relationship to Ward's estate and concerns the discovery of assets and the disposition of his

property.

The Court is also satisfied that Ward's fraudulent intent has been proven.  When

questioned at trial about his false testimony at the § 341 meeting, Ward testified that he was not

prepared to answer the question at the § 341 meeting.  Tr. Trans. 12/13/16 at 126:14-21 (Ward).

If Ward was not prepared to answer the question at his § 341 meeting, why did he?  Ward is a

lawyer and undoubtedly understands the importance of giving true and accurate testimony,

particularly after being placed under oath.  Moreover, his explanation about his false testimony at

the § 341 meeting does nothing to explain his false testimony at trial.  Ward's actions clearly

showed, at the very least, a reckless disregard for the truth sufficient to find that he made the false oaths with fraudulent intent. *In re Duncan*, 562 F.3d at 695.

Thus, for the reasons explained above, the Court concludes that Ward's receipt of a discharge must be denied under 11 U.S.C. § 727(a)(4)(A) due to his multiple false oaths regarding the disposition of the two Porsches and the use of the resulting proceeds.

### d) Ward Testified Falsely Regarding the Funding of the Ward Family Trust.

Ward also gave false testimony at the § 341 meeting regarding money used to fund the Ward Family Trust, a trust established with Amanda as the trustee and Amanda's and his children as the beneficiaries. Tr. Trans. 12/13/16 at 96:7-12 (Ward). At the § 341 meeting, Ward testified that Amanda's family funded the trust, except for approximately $125,000 that was funded by Lloyd Ward & Associates, P.C. *Id.* at 96:7-97:24 (Ward). That testimony was false, and Ward admitted at trial that, at his direction, his entities had funded more than $500,000 into the trust. *Id.* (Ward). Moreover, all money that came into and went out of the Ward Family Trust did so at Ward's direction. *Id.* at 97:21-98:7 (Ward). Later, after the trust was funded, virtually all money in the trust was distributed out to Ward and his entities. Tr. Trans. 12/12/16 at 100:14-102:10 (Amanda).

At trial, Ward attempted to explain his prior, false testimony at the § 341 meeting by claiming he had not reviewed the relevant documents and was not prepared to answer the question. Tr. Trans. 12/13/16 at 97:23-24 (Ward). The Court, however, does not find this testimony credible, particularly since Ward personally caused (i) at least $500,000 to be deposited from his various entities into the trust, and (ii) virtually all money in the trust to be distributed to him or his entities. Moreover, Ward is a lawyer. If he did not know the answer to a question posed while under oath, he knew better than to guess and risk perjuring himself. Instead, Ward's testimony at the § 341

meeting is another example of Ward giving purposefully false testimony to hide the true state of his financial affairs/position from his creditors.

Based upon this record, there is no question that the elements of a § 727(a)(4) claim are satisfied here. Ward clearly gave false testimony at the § 341 meeting regarding how the Ward Family Trust was funded. The statements were not only proven false, but they were material to the Case because the money flowing to and from the trust was at Ward's direction and could be, and as the record shows often were, used to pay Ward's personal expenses and the claims of his creditors. Finally, the testimony was, at best, given with reckless disregard to the truth, as Ward testified he was not prepared to accurately answer the question at the § 341 meeting but answered it anyway. Ward, as a lawyer, knew the consequences of giving false testimony, and his actions clearly evidence a reckless disregard for the truth sufficient to prove fraudulent intent. *In re Duncan*, 562 F.3d at 695.

Thus, for the reasons explained above, the Court concludes that Ward's receipt of a discharge must be denied under 11 U.S.C. § 727(a)(4)(A) due to his giving false testimony regarding the funding of the Ward Family Trust at his § 341 meeting.

### e) Ward Failed to Accurately Disclose the Operating Dates of Entities He Controlled.

Statement of Financial Affairs Item 18 requires a debtor to:

list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, a partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case….

Ward's SOFA filed on the Petition Date listed five entities in response to Item 18. DX 3 at 34 of 56. However, Ward's response to Item 18 on his Amended SOFA, which was filed nearly nine months later and after substantial discovery was undertaken by the Judgment Creditors, listed

sixteen entities. DX 18 at 7-8 of 10. When questioned about this at trial, Ward testified that he

"missed a couple/three companies because they had been dead a couple of years by this point."

Tr. Trans. 12/14/16 at 115:16-18 (Ward). Ward explained that:

> For every company that we own and operate, we keep a formal corporate book. As
> soon as we do an incorporation, we order the corporate books from one of the
> services. When they come in, we fill in the bylaw section, we issue one share of
> stock, we fill in the -- fill in the blank corporate minutes, and then we put it in the
> shelf. And so I've got a -- a shelf in which the books for the companies that we
> own, that I own are sitting there. And so I just go back, and I look to see what
> companies are in the book shelves, these are the companies I own.

*Id.* 115:21-116:5 (Ward).

The entities Ward added to his Amended SOFA in response to Item 18 appear to be entities

that had no corporate books and that Ward, although he knew they existed, did not believe were

"related to him." *Id.* 120:14-121:4 (Ward). According to Ward, his failure to schedule these

entities was related to the large number of entities he operated through.[38] *Id.* 120:24-25 (Ward)

("Now we incorporate—are incorporated under a large number of companies…."). Ward's

explanations ring hollow. Ward chose how many entities he would operate through; just as he

chose not to get corporate books for some of those entities. Yet, once again, he failed to evaluate

carefully what information he was required to disclose in response to SOFA Item 18. This is

simply another example of Ward's intentional deception or, at the very least, reckless disregard

and gross carelessness, in preparing documents filed with the Court under penalty of perjury.

Returning to Ward's failure to accurately disclose operating dates for at least certain of the

disclosed entities, the Court's focus will be on two entities—Lloyd Ward, P.C. and VL Capital.

Ward listed Lloyd Ward, P.C. with an ending date of 2005, a date he testified was accurate during

---

[38] Why Ward operated through so many entities is a bit of a mystery following trial. While Ward attempted to explain the myriad of entities and why they were necessary, the explanation rang hollow. From the Court's perspective, the myriad of entities Ward established or caused to be established with similar names and functions appears designed to make Ward's business affairs overly complicated and hard to untangle.

**MEMORANDUM OPINION** 48

trial.  DX 18 at 7 of 10; Tr. Trans. 12/12/16 at 249:3-10 (Ward).  But the listed date was not accurate (nor was Ward's sworn trial testimony), as the documentary evidence clearly established. In fact, the trial record showed that Ward continued to operate Lloyd Ward, P.C. for many years after 2005.  Tr. Trans. 12/12/16 at 248:21-255:12 (Ward).

For example, Lloyd Ward, P.C. filed tax returns in 2009 and 2010 showing that it had more than $269,000 and $533,000 in gross receipts or sales, respectively.  PX 74 at 00287, 00296. Despite these tax returns, Ward testified that he did not consider Lloyd Ward, P.C. to be an operating entity.  Tr. Trans. 12/12/16 at 249:11-25 (Ward).  When asked whether he would consider an entity that had officers and employees to be operating, Ward responded "[y]es, I would."  *Id.* at 250:3-5 (Ward).  But, when directed to the portions of Lloyd Ward, P.C.'s tax returns showing compensation of officers and salaries and wages to employees, Ward explained that Lloyd Ward, P.C. was paying wages and salaries for people who did not work for it. *Id.* 252:2-16 (Ward).  Ward further testified that Lloyd Ward, P.C. did not have sales, but merely had transfers into its account.  *Id.* at 252:25-253:23 (Ward explaining that money was transferred into Lloyd Ward, P.C. for work it did not do and to pay employees it did not employ, and then reported this information on its tax returns).  Ward also testified that "payroll [for Lloyd Ward & Associates, P.C.] ended up getting set up under Lloyd Ward, P.C., but all the clients and all the work was Lloyd Ward & Associates."  *Id.* at 254:12-15 (Ward).[39]  However, another Ward entity, VL Capital, was depositing funds into Lloyd Ward, P.C.'s account until at least March 19, 2012.  PX 26 at 003340-43.  Moreover, Lloyd Ward, P.C. maintained an IOLTA account through at least November 30, 2011.  PX 31 at 002030 (Account Statement in the name of "Lloyd Ward PC

---

[39] The Court is forced to wonder why (i) money was transferred into Lloyd Ward, P.C. for work it did not do and to pay employees it did not employ, (ii) payroll of Lloyd Ward & Associates, P.C. ended up getting set up under Lloyd Ward, P.C., and (iii) Lloyd Ward, P.C. then reported this information on its tax returns.  At best, odd, and at worst, part of Ward's use of a complex web of entities to make his business dealings obtuse.

IOLTA" showing activity). Ultimately, it is not until 2013 (not 2005) that Lloyd Ward, P.C.'s tax returns show no activity. PX 74 at 00341.

Thus, the trial record clearly demonstrates that the 2005 ending date sworn to by Ward on his Amended SOFA and in his trial testimony was clearly false. Lloyd Ward, P.C. continued to have substantial financial dealings well past 2005.

Ward also listed VL Capital in response to Item 18 of his Amended SOFA with an ending date of 2012. But, financial records show that VL Capital continued to operate until at least the end of May 2013. PX 25 at 1442-1456 (bank records showing activity during 2013); *see also* Tr. Trans. 12/13/16 at 10:4-32:14 (Ward). At trial, Ward acknowledged that, beginning in 2010 and until "sometime" in 2013, the sole purpose of VL Capital was to collect cash from Ward-related entities and disburse it "to wherever [Ward] needed it to go," including to him, his wife and others. Tr. Trans. 12/13/16 at 12:16-20 (Ward). Why VL Capital collected cash from other entities and disbursed it at Ward's direction was never fully or satisfactorily explained.[40] But, in any event, VL Capital's operations in 2010-2012 would appear no different than they were in 2013, making the 2012 ending date sworn to by Ward in the Amended SOFA false.

Once again, the elements of a § 727(a)(4)(A) claim have been clearly established. Based on the record before it, the Court finds that Ward made statements under oath (at trial and in response to SOFA Item 18 and Amended SOFA Item 18) regarding the operating dates for Lloyd Ward, P.C. and VL Capital, and that those statements were false. Moreover, Ward knew those statements were false given his active involvement with those two entities. Further, the money

---

[40] When questioned why money was funneled through VL Capital, Ward's only explanation was "Robert Pendergrass [the alleged CFO of Lloyd Ward Group, P.C.] requested we do that. He didn't want to pay—have Lloyd Ward Group accumulating money, and paying bills directly out of Lloyd Ward Group. His opinion was that we needed to essentially have a management company in place that would collect all of the overflow money, and then redistribute it back out." Tr. Trans. 12/13/16 at 159:22-160:4 (Ward).

flowing to and from those two entities moved at Ward's sole discretion and could be used, and as the record shows often was used, to pay Ward's personal expenses and creditors. Thus, the statements were material to the Case as they bore a relationship to Ward's business transactions or estate and concerned the discovery of assets, business dealings or the existence and disposition of his property. Finally, the Court finds that (i) Ward's consistent pattern of material misstatements to the Court, and (ii) the gross carelessness with which he prepared his SOFA and Amended SOFA show, at the very least, a reckless disregard for the truth sufficient to prove that Ward made these false oaths with fraudulent intent. *In re Duncan*, 562 F.3d at 695.

Thus, for the reasons explained above, the Court concludes that Ward's receipt of a discharge must be denied under 11 U.S.C. § 727(a)(4)(A) due to the false oaths appearing on his SOFA and Amended SOFA regarding the operating dates of Lloyd Ward, P.C. and VL Capital, as well as for the false testimony regarding Lloyd Ward, P.C.'s operating dates Ward gave at trial.

### 2. Section 727(a)(5) – Ward has Failed to Explain Satisfactorily a Loss of Assets.

The Plaintiffs also object to Ward receiving a discharge under § 727(a)(5), alleging that Ward has failed to explain satisfactorily the dissipation (or disappearance) of substantial sums of money. In this regard, Bankruptcy Code § 727(a)(5) provides that "[t]he court shall grant the debtor a discharge unless ... the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). The Plaintiffs bear the initial burden to produce some evidence of the disappearance of substantial assets or of unusual transactions to establish a § 727(a)(5) claim. *In re Reed*, 700 F.2d at 993 (creditor demonstrated disappearance of $19,586.83 in cash); *Benchmark v. Crumley* (*In re Crumley*), 428 B.R. 349, 371 (Bankr. N.D. Tex. 2010) (creditor established significant cash withdrawals). The mere allegation that the debtor has failed

to explain losses is insufficient; instead, the creditor must establish a prima facie case of loss or unusual transactions to shift the burden to the debtor to provide a satisfactory explanation. *Crumley*, 428 B.R. at 371. What constitutes a satisfactory explanation has not been definitively defined, but a lack of wisdom in the debtor's expenditures, standing alone, is not grounds for denial of a discharge. *Cadlerock Joint Venture, L.P. v. Sauntry (In re Sauntry)*, 390 B.R. 848, 857 (Bankr. E.D. Tex. 2008). The proper focus under § 727(a)(5) is on the credibility of the proffered explanation rather than the propriety of the disposition of the assets, and an explanation need not even be meritorious to be satisfactory. *Neary v. Guillet (In re Guillet)*, 398 B.R. 869, 890 (Bankr. E.D. Tex. 2008).

At trial, Ward testified that he was the sole officer of Lloyd Ward Group, P.C. Tr. Trans. 12/12/16 at 239:13-241:10 (Ward). The 2010 tax return of that entity shows compensation to officers of $1,325,000. PX 73 at 00209 (Line 7). When questioned about this compensation, Ward testified that his prior testimony that he was the sole officer of Lloyd Ward Group, P.C. was not accurate and that Lloyd Ward Group, P.C. had two additional officers, a CFO and a CEO. Tr. Trans. 12/12/16 at 268:6-24 (Ward). When pressed, however, Ward testified that each of these additional officers was paid approximately $130,000 (which Plaintiff's counsel rounded to $200,000 each during further questioning, resulting in the Plaintiffs' rough estimate of $900,000 in compensation paid to Ward). *Id.* 269:3-10 (Ward). Ward then testified that the 2010 tax return he was being questioned from had been superseded and the Court was directed to the 2010 tax return beginning at PX 73, Bates no. 00199. However, when shown that the return beginning at Bates no. 00199 also showed officer compensation of $1,350,000, Ward testified that he did not believe that return was the correct return either, despite the stipulation of his counsel that PX 73

**MEMORANDUM OPINION**                                                                 52

was a true and accurate copy of the return as filed with the IRS. *Id.* at 270:9-25 (Ward).[41] The

Court ultimately bound Ward to his counsel's stipulation regarding PX 73 being the filed 2010 tax

returns for Lloyd Ward Group, P.C. *Id.* at 273:18-19. Thus, the Plaintiffs established that, in 2010,

Ward received, at most, $1,350,000 or, at least, $900,000 in compensation as an officer of Lloyd

Ward Group, P.C.

When questioned by his counsel regarding those funds and where they went, Ward testified

that a third party (Mr. Miles) had been "misallocating funds" in relation to Lloyd Ward Group,

P.C. and "had been showing expenses that didn't exist, and taking money out of the company

under the payroll. And at the time, we approximated it to be about $900,000." Tr. Trans. 12/13/16

at 149:19-25 (Ward). Ward further testified that these actions resulted in a lawsuit and a judgment

against Mr. Miles, Silverleaf Debt Solutions, and Debt RX that, Ward testified "was right at

$900,000 against [Mr. Miles'] companies [and] ended up being over $2 million." *Id.* at 151:17-

25 (Ward). Finally, Ward testified that he believes the judgment against the Mr. Miles' entities is

uncollectible. *Id.* at 154:2-6 (Ward). Other than this, Ward gave no explanation of where the

$900,000 of compensation the tax return shows he was paid went.

The Court finds Ward's testimony regarding the $1,350,000 (or $900,000) of compensation

paid to him unpersuasive for several reasons. First, Ward's testimony in this regard, in fact

throughout the trial, was self-serving, not credible, or both. Ward's testimony often changed based

upon the situation he was presented with – *e.g.*, he was the only officer, until shown substantial

compensation to officers; the tax returns were accurate, until they conflicted with his schedules or

---

[41] PX 67 is Lloyd Ward's Stipulation Regarding Authenticity of Tax Documents that was signed by Ward's attorney. Although never moved into evidence, the stipulation was referred to multiple times during trial and addresses the authenticity of various tax documents that were admitted into evidence. The stipulation states that "the 2010 Form 1120S and related documents, bates labelled 00190-00225, are true and correct copies of all documents filed with the IRS related to Lloyd Ward Group, P.C.'s tax return for the 2010 tax year." PX 67 ¶ 17.

were harmful to him. Second, if Ward's testimony is to be believed and the $900,000 was somehow absconded with by Mr. Miles, why would Lloyd Ward Group, P.C. include the amount as "[c]ompensation to officers" on its tax returns when (i) the funds were allegedly stolen from it (so there wouldn't have been anything to pay to its officers as compensation), and (ii) there is absolutely nothing in the record indicating that Mr. Miles was an officer of Lloyd Ward Group, P.C.? *See* Tr. Trans. 12/12/16 at 268:6-25 (Ward testifying that Don Frey and Robert Pendergrast served as CEO and CFO, respectively, and that his earlier testimony that he was the sole officer was not accurate). It is simply not plausible that Ward (a lawyer and sophisticated businessman) would permit an entity he controlled to file a tax return showing substantial compensation to him if, in fact, that money was not paid to him.

Based upon the record before it, this Court finds, by a preponderance of the credible evidence, that the Plaintiffs established a prima facie case of loss related to the $1,350,000 in compensation paid by Lloyd Ward Group, P.C. to its officers—at least $900,000 of which would have been paid to Ward. Thus, the burden shifted to Ward to provide a satisfactory explanation for the where these monies, which were paid to him as compensation, went, which he failed to do. Thus, Ward's receipt of a discharge must be denied under 11 U.S.C. § 727(a)(5).

## IV. CONCLUSION

As fully detailed above, Court finds that (i) Ward made numerous false statements during the Case under oath, including in his Schedules, Amended Schedules, SOFA, Amended SOFA and in his testimony both at trial and at his § 341 meeting of creditors, (ii) Ward knew the statements were false when he made them, (iii) Ward made the statements with fraudulent intent or, at the very least, with a reckless disregard for the truth sufficient to support a finding of fraudulent intent, as evidenced by Ward's serial false oaths and gross carelessness and outright disregard for accuracy in preparing documents filed under oath with this Court, and (iv) the false statements

related materially to the Case because they each bear a relationship to Ward's business transactions or estate, and/or concern the discovery of assets, business dealings, or the existence and disposition of his property. Thus, the Court concludes that Ward's receipt of a discharge must be denied pursuant to 11 U.S.C. § 727(a)(4)(A).

As also detailed above, the Court further finds that Ward has failed to explain satisfactorily the loss of at least $900,000 in compensation paid to him in 2010 as an officer of Lloyd Ward Group, P.C. Thus, the Court concludes that Ward's receipt of a discharge must be denied pursuant to 11 U.S.C. § 727(a)(5).

"If any one ground for a denial of discharge is established, the Court does not need to decide the propriety of any of the other grounds." *In re DeVoll,* 266 B.R. at 98 (citing *In re Beaubouef,* 966 F.2d at 177; *Hibernia Nat'l Bank v. Perez (In re Perez)*, 954 F.2d 1026, 1027 (5th Cir.1992)). Because the Court finds ample support in the record for the denial of Ward's discharge under both 11 U.S.C. §§ 727(a)(4)(A) and (a)(5), it is not necessary to address the Plaintiffs' remaining claims.

A Final Judgment denying Ward's discharge shall be entered separately. The Court hereby directs the parties' counsel to confer with each other and attempt to submit an agreed form of Final Judgment to the Court consistent with this Memorandum Opinion within 14 days after the entry of the Memorandum Opinion on the Court's docket. If no agreement can be reached, each party shall submit its own proposed form of Final Judgment on the fifteenth day after entry of the Memorandum Opinion on the Court's docket, along with an explanation of why the other side's proposed form of Final Judgment is improper.

### # # # END OF MEMORANDUM OPINION # # #